**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| GORDIAN MEDICAL, INC. d/b/a | : | CIVIL ACTION |
| AMERICAN MEDICAL TECHNOLOGIES, | : | |
| v. | : | |
| GENTELL, INC., FREDRIC A. BROTZ, KATHLEEN E. | : | |
| KENNEDY, ELIZABETH J. MEYERS, JOELLEN FISCHER, and | : | NO. |
| PEGGY T. BATES. | | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.      ( x )

_David Kessler/ ALB_

| | | |
|---|---|---|
| October / , 2012 | David J. Kessler, Esq. | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 212-318-3000 | 212 318 3400 | dkessler@fulbright.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

## Civil Justice Expense and Delay Reduction Plan
## Section 1:03 - Assignment to a Management Track

(a)    The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)    In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)    The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)    Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)    Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

## SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Gordian Medical, Inc. d/b/a American Medical Technologies

## DEFENDANTS
Gentell, Inc., Fredric A. Brotz, Kathleen E. Kennedy, Elizabeth J. Meyers, Joellen Fischer, and Peggy T. Bates

**(b)** County of Residence of First Listed Plaintiff   Orange Co., CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Montgomery Co., PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David J. Kessler, Esq., Fulbright & Jaworski LLP, 666 Fifth Avenue
New York, NY 10103-3198, 212-318-3000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ❏ 2  U.S. Government Defendant
- ❏ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*                      *(and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Product Liability | | 28 USC 157 | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | Liability | ❏ 367 Health Care/ | | | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Product Liability | | ❏ 830 Patent | ❏ 470 Racketeer Influenced and |
| ❏ 152 Recovery of Defaulted | Liability | ❏ 368 Asbestos Personal | | ❏ 840 Trademark | Corrupt Organizations |
| Student Loans | ❏ 340 Marine | Injury Product | | | ❏ 480 Consumer Credit |
| (Excl. Veterans) | ❏ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | Act | ❏ 862 Black Lung (923) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ☒ 190 Other Contract | Product Liability | ❏ 380 Other Personal | ❏ 740 Railway Labor Act | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Property Damage | ❏ 751 Family and Medical | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| ❏ 196 Franchise | Injury | ❏ 385 Property Damage | Leave Act | | ❏ 895 Freedom of Information |
| | ❏ 362 Personal Injury - | Product Liability | ❏ 790 Other Labor Litigation | | Act |
| | Med. Malpractice | | ❏ 791 Empl. Ret. Inc. | | ❏ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Security Act | **FEDERAL TAX SUITS** | ❏ 899 Administrative Procedure |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | ❏ 510 Motions to Vacate | | ❏ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ❏ 220 Foreclosure | ❏ 441 Voting | Sentence | | or Defendant) | Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | **Habeas Corpus:** | | ❏ 871 IRS—Third Party | ❏ 950 Constitutionality of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | ❏ 530 General | | 26 USC 7609 | State Statutes |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | |
| | Employment | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus - | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | Alien Detainee | | |
| | Other | ❏ 560 Civil Detainee - | (Prisoner Petition) | | |
| | ❏ 448 Education | Conditions of | ❏ 465 Other Immigration | | |
| | | Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from another district *(specify)*
- ❏ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Civil action alleging, among others, Tortious Interference, Defamation, Conspiracy, Conversion, Breach of Contract

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** 750,001.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*

JUDGE _____   DOCKET NUMBER _____

DATE   10/1/12

SIGNATURE OF ATTORNEY OF RECORD   David Kessler / ALB

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 09/11)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdicti on arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause **Do not cite jurisdictional statutes unless diversity.**     Example:     U.S. Civil Statute: 47 USC 553
          Brief Description: Unauthorized reception of cable service

**VII.     Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: __17595 Cartwright Road, Irvine, California 92614__

Address of Defendant: ____1957 Pioneer Road, Bldg H, Huntingdon Valley, Pennsylvania 19006, see also paragraphs 7-12__

Place of Accident, Incident or Transaction: __Pennsylvania__
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))       Yes☐   No☒

Does this case involve multidistrict litigation possibilities?       Yes☐   No☒
*RELATED CASE, IF ANY:*
Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐   No☒

---

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
(Please specify) __Intentional Interference, Breach of Contract, Defamation, Conspiracy, Unfair Competition, Pennsylvania Uniform Trade Secrets Act,__

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, __David Kessler__, counsel of record do hereby certify:
☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: __10/1/12__      __David Kessler ALB__      __81551__
                           Attorney-at-Law                    Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __10/1/12__      __David Kessler ALB__      __81551__
                           Attorney-at-Law                    Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GORDIAN MEDICAL, INC. d/b/a )   Case No.
AMERICAN MEDICAL )   _____
TECHNOLOGIES, )
 )   *Assigned to*:
           Plaintiff, )   _____
 )
   vs. )   Jury Trial Demanded
 )
GENTELL, INC., FREDRIC A. )
BROTZ, KATHLEEN E. )
KENNEDY, ELIZABETH J. )
MEYERS, JOELLEN FISCHER, )
and PEGGY T. BATES )
 )
          Defendants. )
 )

## COMPLAINT

Plaintiff Gordian Medical, Inc. d/b/a American Medical Technologies
("AMT"), by and through its undersigned counsel, hereby files this Complaint
against Defendants Gentell, Inc., Fredric A. Brotz, Kathleen E. Kennedy, Elizabeth
J. Meyers, Joellen Fischer, and Peggy T. Bates (collectively "Defendants").

## I.    PRELIMINARY STATEMENT

1.    This case arises from the malicious and opportunistic actions of
AMT's direct business competitor, Gentell, Inc., Fredric A. Brotz, one of Gentell
Inc.'s highest-ranking officials, and four former AMT employees, Kathleen E.
Kennedy, Elizabeth J. Meyers, Joellen Fischer, and Peggy T. Bates.

2.    Defendants, individually and in concert, caused, and continue to
cause, severe damage to AMT's business of providing essential wound care
services by intentionally sabotaging AMT's existing contractual relationships with

its trusted and valued customer facilities.

3.      In order to perpetuate their scheme, Defendants employed unlawful tactics in a deliberate attempt to destroy AMT's business by, among other things: (1) disseminating known falsities to AMT's existing customers regarding AMT's ability to continue to provide services; and (2) using confidential and trade secret information inappropriately obtained from AMT in order to induce and misappropriate AMT's clients and damage AMT's goodwill with its customers.

4.      Even more egregious, Defendant Fredric A. Brotz, Gentell's President, willfully created a fraudulent document purporting to be from CPS Services, one of AMT's established customers, and improperly attempted to terminate CPS Services' valid and existing contract with AMT.

5.      As a proximate cause of Defendants' willful and malicious actions, AMT has suffered, and continues to suffer, real and actual damages to its ongoing operations in providing critical wound care services.

## II.   PARTIES

6.      Gordian Medical, Inc. d/b/a American Medical Technologies is incorporated under the laws of the State of Nevada and duly qualified to do business in California, having its headquarters and principal place of business at 17595 Cartwright Road, Irvine, California 92614.

7.      Upon information and belief, Defendant Gentell, Inc. ("Gentell") is incorporated under the laws of the Commonwealth of Pennsylvania, having its headquarters and principal place of business at 1957 Pioneer Road, Bldg H, Huntingdon Valley, Pennsylvania 19006.

8.      Upon information and belief, Defendant Fredric A. Brotz ("Brotz") is

2

domiciled in the State of New Jersey, maintaining his principal residence at 4 Lucerne Court, Cherry Hill, New Jersey 08003.

9.     Upon information and belief, Defendant Elizabeth J. Meyers ("Meyers") is domiciled in the State of Illinois, maintaining her principal residence at 980 Cobblers Crossing, Elgin, Illinois 60120.

10.    Upon information and belief, Defendant Kathleen E. Kennedy ("Kennedy") is domiciled in the State of Illinois, maintaining her principal residence at 630 68th Street, Willowbrook, Illinois 60527.

11.    Upon information and belief, Defendant Joellen Fischer (a/k/a Joellen Lane-Meissner, a/k/a Jo Lane) ("Fischer") is domiciled in the State of Wisconsin, maintaining her principal residence at N6054 Hillcrest Drive, Plymouth, Wisconsin 53073.

12.    Upon information and belief, Defendant Peggy T. Bates ("Bates") is domiciled in the State of Illinois, maintaining her principal residence at 6450 Stonington Way, Roscoe, Illinois 61073.

## III.   JURISDICTION AND VENUE

13.    Because the parties are completely diverse and the amount in controversy exceeds $75,000.00, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3).

## IV.   FACTUAL BACKGROUND

### A.    AMT's Wound Care Services.

15.    AMT is a leading independent provider of wound care solutions for long-term care facilities throughout the United States. AMT has provided top

3

quality wound care programs since 1994 and currently services over 14,000 patients in more than 3,000 facilities nationwide.  AMT employs nearly 400 people in locations around the country.  Most of the patients for which AMT provides services are elderly and confined to hospice or long-term care facilities.

16.    AMT focuses on medical expertise, protocol development, education, healing and preserving and /or enhancing patients' quality of life.  AMT continually strives to champion the movement to improve the quality of care in America's nursing homes through excellence in wound evaluation, treatment, and assessment of progress based upon the most current scientific research available.

17.    AMT is a participating Medicare provider.  Medicare is a national social insurance program, administered by the federal government that guarantees access to health insurance for Americans ages 65 and older and younger people with disabilities, as well as people with end-stage renal disease.

18.    Access to Medicare is an essential service AMT provides to the eligible patients in its customer facilities.  As a participating Medicare provider, AMT, after providing medically necessary wound care supplies to eligible patients in its customer facilities, directly bills the Medicare program for reimbursement, thus relieving these facilities of the burden of increased costs and processing additional paperwork.

### B.    AMT's 2012 Billing Dispute with Medicare and Subsequent Voluntary Chapter 11 Bankruptcy Petition.

19.    In late 2011, AMT and the Medicare program became involved in a billing dispute related to AMT's provision of medical dressings for gastrostomy tube sites, pursuant to which Medicare refused to reimburse AMT for theses dressings.

4

20.     AMT, relying on clear and unambiguous language in the Medicare guidelines, believed it was legally entitled to reimbursement for these supplies.  In response to AMT's demands for reimbursement, the Medicare program suspended reimbursement for **_all_** dressings supplied by AMT to its customer facilities.

21.     In order to maintain its ability to continue supplying vital wound care supplies and valuable instruction to its customer facilities, AMT made the business decision to seek Chapter 11 bankruptcy protection on February 24, 2012.

22.     On February 24, 2012 – the same day it filed its Chapter 11 bankruptcy petition – AMT received approval from the bankruptcy court to continue its operations in the ordinary course.

23.     On March 9, 2012, AMT released a public statement confirming that AMT had "not been accused of fraud, is not in legal trouble, and is not on any list of 'excluded entities'" prohibited from working with the Medicare program. Moreover, AMT indicated that through the Chapter 11 filing, it was able to "continue operating without interruption while [it] resolve[s] these issues as expeditiously as possible," using its existing funds to support its operations.

24.     AMT also announced that it had reached an agreement with the Medicare program whereby Medicare "agreed to pay the majority of [AMT's] claims while the two entities pursue a final resolution of their billing dispute," confirming AMT's "right to continue to bill [Medicare] as a Medicare supplier in good standing."  In particular, Medicare agreed to release a significant portion of the funds it had withheld from AMT since November 2011.

25.     AMT's handling of its billing dispute with Medicare through the Chapter 11 bankruptcy proceedings demonstrated that AMT was, and continues to

be, a viable, ongoing business able to maintain uninterrupted service and delivery of critical wound care supplies to its customer facilities.

### C.     The Fraudulent May 9, 2012 Letter from CPS to AMT.

26.     AMT is victim of a fraudulent scheme devised by AMT's direct competitor, Gentell, through Defendant Fredric A. Brotz ("Brotz"), Gentell's President.  Specifically, upon information and belief, Brotz created and transmitted a fraudulent letter purporting to be from one of AMT's customer chains informing AMT that the chain's existing business relationship with AMT would be terminated.

27.     On May 9, 2012, AMT received a letter (the "May 9 Letter") purporting to be from John Kruger ("Kruger"), Senior Vice President of CPS Services ("CPS") in Rochelle Park, New Jersey.

28.     A true and correct copy of the May 9 Letter is attached hereto as Exhibit 1.

29.     CPS was an existing valued customer of AMT, operating numerous facilities, many of which had signed BAAs with AMT.

30.     The May 9 Letter directed AMT to "accept this letter as notice of [CPS's] intend [sic] to terminate your services provided to our facilities as listed below."

31.     The May 9 Letter listed nine (9) CPS facilities around New Jersey at which AMT's services would no longer be needed.

32.     Documentary evidence establishes that the May 9 Letter was received via facsimile by AMT.

6

33.     Upon receipt of the May 9 Letter, AMT's computer systems were updated to reflect that the CPS account had been terminated.

34.     Unaware of CPS's putative termination of AMT, the following month, Maureen Romeo ("Romeo"), AMT's clinical specialist responsible for the CPS account, forwarded CPS's order for wound care supplies to AMT's processing department.

35.     Romeo was informed by the processing department that the CPS account had been terminated by CPS pursuant to the May 9 Letter.

36.     Romeo then contacted Lisa Allegri ("Allegri"), regional manager responsible for the CPS account.  Allegri telephoned Kruger, who informed Allegri that he knew nothing about the May 9 Letter.

37.     On June 14, 2012, Kruger transmitted a letter to Allegri (the "June 14 Letter") stating that "[t]his will confirm that I did not sign or send [the May 9 Letter], and no one was authorized to sign or send it on my behalf.  CPS Services has no desire to end its relationship with AMT at this time."

38.     A true and correct copy of the June 14 Letter is attached hereto as Exhibit 2.

39.     Upon information and belief,  Brotz – Gentell's highest-ranking officer – later admitted to industry contacts that he sent the May 9 Letter purporting to be from CPS.

40.     Further, records from the telephone company and the fax service provider conclusively prove that the May 9 Letter was faxed from a telephone line personally registered to Brotz.

**D.**      **AMT's Commitment to Protecting Confidential and Proprietary Information.**

41.     AMT and its customer facilities routinely enter into business contracts called Business Associate Agreements ("BAAs").

42.     The BAAs are designed, among other things, to protect patient confidences, and to this end, the BAAs contain a strict confidentiality provision regarding documents and information that customer facilities provide to AMT.

43.     In order to protect the interests of its customer facilities, AMT goes to great lengths to guard the highly sensitive and confidential information provided to AMT by its customer facilities. As a result, AMT mandates that its employees sign confidentiality agreements.

44.     The AMT employee confidentiality agreements also serve to protect AMT's confidential and proprietary information, such as customer lists, customer information, sales prospects, costs and pricing information, and other information about AMT's business, processes, and procedures.

45.     As a result, AMT provides all new employees with, among other things: (i) a Workforce Confidentiality Agreement; (ii) an AMT Employee Handbook, and (iii) an Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition.

### *i)      Workforce Confidentiality Agreement*

46.     New AMT employees are asked to sign, before starting work, a Workforce Confidentiality Agreement ("WCA"), which states, in relevant part, that:

> [AMT's]  billing  procedures,  client  information  and

8

ongoing business is privileged, confidential and not to be conveyed, discussed, or made aware of, by any means of communication to any person, company, or entity outside of the [AMT] Office, without management's approval.

…

By signing this document I understand and agree that:

I will disclose Patient Information and/or confidential Information only if such disclosure complies with [AMT's] policies, and is required for performance of my job.

…

I will not make any unauthorized transmissions, copies, disclosures, inquiries, modifications or purging of Patient Information or Confidential Information.   Such unauthorized transmissions include but are not limited to, removing and/or transferring Patient Information or Confidential Information from [an AMT] computer or [AMT] computer system to unauthorized locations.

Upon termination of my employment with [AMT] I will immediately return all property (i.e. keys, documents, ID badges, etc.) to [AMT].

I agree that my obligations under this agreement regarding Patient Information will continue after the termination of my employment with [AMT].

47.    All new AMT employees are required to read and sign a copy of the WCA prior to employment.

### ii)    *AMT Employee Handbook*

48.    An employee handbook (the "Employee Handbook") is made accessible to all new employees for them to read and acknowledge.  The Employee Handbook provides standards of performance and conduct for its employees, a Code of Business Ethics and Conduct, and provisions regarding

9

confidentiality.

49.     The Employee Handbook prohibits, among other things, the following conduct:

> Improperly releas[ing] confidential information about the company ... or [its] ... customers and vendors, employees; [and]
>
> Violat[ing] of any company rule, practice or policy, including any policy in this Handbook.

50.     The Employee Handbook mandates, among other things, that AMT employees: "[P]rotect confidential information;" and "[M]aintain honest and fair relationships with all of the company's vendors."

51.     The Employee Handbook also includes an express confidentiality provision, which states, in relevant part:

> As an employee, you may learn information that is not known by the general public.  You may have access to confidential or proprietary information regarding the company, its vendors, its customers, or perhaps even fellow employees.   Confidential or proprietary information includes, but is not limited to business plans, strategies, budgets, projections, forecasts, financial and operating information, business contracts, databases, employee information, customer and vendor information, compensation data, advertising and marketing plans, proposals, training materials and methods, and other information not available to the public.
>
> Regardless of whether this type of information is specifically classified as confidential, it is each employee's responsibility to keep this information in confidence.   **You have a responsibility to prevent using, revealing or divulging any such information**

**unless it is necessary for you to do so in the performance of your duties.** (emphasis added).

52.    All new AMT employees are required to read the Employment Handbook and comply with all provisions therein.

### iii)    *AMT's Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition (the "Confidentiality Agreement")*

53.    AMT also requires that new employees read and sign the Confidentiality Agreement, which contains the following provisions related to, *inter alia*, confidentiality and non-competition:

> **5.  Confidential Information.**  As used herein, the term "Confidential Information" means any and all confidential proprietary or secret information, including that conceived or developed by Employee, applicable to or in any way related to (i) the present or future business of [AMT], (ii) the research and development of [AMT], or (iii) the business of any client or vendor of [AMT]. Such Confidential Information of [AMT] includes, by way of example and without limitation, trade secrets, processes, formulas, data, program documentation, algorithms, source codes, object codes, knowhow, improvements, inventions, techniques, all plans or strategies for marketing, development and pricing, all information concerning existing or potential clients or vendors, and all similar information disclosed to [AMT] by others.  The Confidential Information is a special, valuable, and unique asset of [AMT], and I will at all times during the period of my employment, and at all times after termination of such employment, not use (except as my duties for [AMT] may require) or disclose for any purpose, and keep in strict confidence, all Confidential Information.
> …
>
> **7.  Termination; Non-Competition.**  Upon termination

11

of my employment with [AMT], (a) I will deliver to it all records, data and memoranda of any nature in my possession or control related to my employment or the activities of [AMT], including, for example, notebooks, diaries, reports, photographs, films, manuals and computer software media, and (b) I will honor and abide by my continuing obligation of confidentiality. I will not engage in Competition (as defined below) with [AMT], within the territory which I service during my employment, while I am a [AMT] employee and for a period of one year after termination of my employment for any reason. As used herein, "Client" means any person or organization (including, for example, a nursing home, doctor's office or other facility) which refers beneficiaries to [AMT], and/or to whom or on whose behalf I render any services during my employment with [AMT]   "Competition" means: (a) during my employment with [AMT], except in the course of such employment, (i) soliciting or accepting employment with, or (ii) rendering any services whatsoever to, any Client; and (b) after termination of my employment, (i) soliciting or accepting employment with, or (ii) rendering services related to wound prevention or treatment to, any Client.

54.    All new AMT employees are required to read and sign a copy of the Confidentiality Agreement prior to employment.

### E.    AMT Employment History of Defendants Elizabeth Meyers, Kathleen Kennedy, Joellen Fischer, and Peggy Bates.

#### i)    *Defendant Elizabeth Meyers*

55.    On December 6, 2004, Defendant Meyers was hired by AMT as a sales and business development manager. Based from her home in the Chicago, Illinois area, Meyers was assigned to provide services to the following territories: Illinois, Wisconsin, Minnesota, Missouri, and Iowa.

56.     Meyers' duties included traveling to existing and prospective customer facilities in order to secure BAAs and maintain AMT's valued and trusted client relationships.

57.     Meyers' responsibilities required close interaction with staff members at various facilities in her assigned territories.

58.     On December 6, 2004, Defendant Meyers signed the WCA.

59.     A true and correct copy of the WCA signed by Meyers is attached hereto as Exhibit 3; *see also supra*, ¶ 46, for the relevant terms of the WCA.

60.     Meyers read and acknowledged to be bound by the terms of the AMT Employment Handbook.  *See* Exhibit 4.

61.     On December 7, 2010, Meyers signed the Confidentiality Agreement.

62.     A true and correct copy of the Confidentiality Agreement signed by Meyers is attached hereto as Exhibit 5; *see also supra*, ¶ 53, for the relevant terms of the Confidentiality Agreement.

63.     Meyers had a long history of counseling and warnings from her supervisors at AMT related to unprofessional conduct, including instances related to poor communications with her co-manager, Gary Reckart, and failure to introduce him to all accounts and/or applicable contacts in Meyers' region.

64.     On or about May 21, 2012, as a direct result of her pervasive job performance issues, AMT offered a severance package to Meyers in lieu of termination, but Meyers declined to agree to the severance package or sign a release related thereto.

65.     As a result of Meyers' long history of refusing to conform to the standards of professional conduct demanded by AMT, Meyers was suspended from employment on May 16, 2012, and finally terminated on or about May 25, 2012.

66.     On May 31, 2012, Meyers signed an AMT Exit Acknowledgment and Checklist agreement (the "Exit Agreement").

67.     A true and correct copy of the Exit Agreement signed by Meyers is attached hereto as Exhibit 5.

68.     The Exit Agreement states, in relevant part, that:

> I have returned, or will return to [AMT], all property belonging to [AMT] including but not limited to equipment, confidential information, whether stored electronically or on paper, and all copies thereof.  Any exceptions to this are listed below and I acknowledge my responsibility to return to said objects by the date indicated.
>
> …
>
> I have complied with **and will continue to comply with** all the terms of any/all agreements that I have signed (confidentiality, trade secrets, employee handbook), and will not disclose any information that is confidential or could be detrimental to [AMT].
>
> I also agree that I will preserve as confidential and not use, **for the benefit of myself or others, any confidential information, customer lists**, product designs, processes, or other information that has now or could in the future have economic value to [AMT]. (emphasis added)

See Exhibit 5 (emphasis added).

69.     Despite being suspended on May 16, 2012, Meyers continued to have

14

access to her e-mail account at AMT until May 23, 2012, and used that time to forward, without authorization, a substantial number of proprietary files from her AMT e-mail account to her personal e-mail account, including, but not limited to, AMT generated sales reports related to individual AMT customer facilities and AMT customer lists.  These highly confidential and proprietary reports provide the precise costs for certain wound care supplies provided to AMT customer facilities. These spreadsheets are extremely valuable to AMT, as the information provided therein evidences cost savings provided to individual customer facilities, as well as the value AMT attributes to each customer facilities – based on number of supplies ordered and purchased by AMT's customer facilities.

70.    Additionally, during this time, Meyers also improperly forwarded at least one document containing confidential proprietary information to Defendant Kennedy.

71.    On May 25, 2012, AMT's Vice President and General Counsel, David R. Simon ("Simon"), sent a letter via e-mail to Meyers (the "Simon Letter").

72.    A true and correct copy of the Simon Letter is attached hereto as Exhibit 6.

73.    The Simon Letter demanded that Meyers:

    a.    "immediately cease and desist any and all use or distribution, in whole or in part, of any and all AMT Intellectual Property, and any works derived therefrom;"

    b.    "immediately destroy all copies of AMT Intellectual Property in your possession and control;"

    c.    "immediately cause Kathy Kennedy and any other

15

> third parties to whom you have transferred, and/or allowed to be transferred, any AMT Intellectual Property to destroy all AMT Intellectual Property in their possession or control;"

> d.    "desist from any further infringement of AMT's rights, whether copyrights, trade secrets, trademarks or other intellectual property rights, now and in the future;" and

> e.    "certify to AMT in writing, by signing and returning the attached affidavit, that you have complied with and will continue to comply with the foregoing."

74.    AMT did not receive a response from Meyers regarding the Simon Letter, and Meyers never signed or returned the affidavit sent to her by Simon.

### ii)    *Defendants Kathleen Kennedy and Joellen Fischer*

75.    Upon information and belief, Defendant Kennedy was hired as an employee of AMT on September 12, 2006.

76.    Upon information and belief, Defendant Fischer was hired as an employee of AMT on September 28, 2007.

77.    Kennedy signed the WCA on or about September 12, 2006.

78.    A true and correct copy of the WCA signed by Kennedy is attached hereto as Exhibit 7; *see supra*, ¶ 46, for relevant terms of the WCA.

79.    Kennedy read and acknowledged to be bound by the terms of the AMT Employment Handbook.  *See* Exhibit 8.

80.    Kennedy signed the Confidentiality Agreement on or about December 9, 2010.

16

81.     A true and correct copy of the Confidentiality Agreement signed by Kennedy is attached hereto as Exhibit 8; *see supra*, ¶ 53, for relevant terms of the Confidentiality Agreement.

82.     Fischer signed the WCA on or about September 28, 2007.

83.     A true and correct copy of the WCA signed by Fischer is attached hereto as Exhibit 9; *see supra*, ¶ 46, for relevant terms of the WCA.

84.     Fischer read and acknowledged to be bound by the terms of the AMT Employment Handbook.  *See* Exhibit 10.

85.     Fischer signed and executed the Confidentiality Agreement on or about December 8, 2010.

86.     A true and correct copy of the Confidentiality Agreement signed by Fischer is attached hereto as Exhibit 10; *see supra*, ¶ 53, for relevant terms of the Confidentiality Agreement.

87.     Both Fischer and Kennedy held positions as clinical specialists, and their responsibilities included interacting with staff members at various facilities in their respective territories and educating facility personnel regarding AMT's proprietary wound care techniques and documentation processes.

88.     Both Fischer and Kennedy handled relationships with customer facilities in the Illinois market, while Fischer also covered portions of Wisconsin.

89.     Both Fischer and Kennedy had access to AMT confidential information including, but not limited to, patient information, customer lists, customer information, sales prospects, costs and pricing information, and information about AMT's business, processes, and procedures.

17

90.     During early 2012, as part of a two-stage reduction in force that resulted in a total of twenty-eight employees being laid off within two weeks, AMT determined that it was overstaffed by two positions in the central-northern United States.  Following a thorough, systematic, and unbiased review, AMT made the business decision to eliminate positions held by Fischer and Kennedy.

91.     As part of this reduction in force, AMT offered severance packages to all personnel, including Fischer and Kennedy.

92.     Both Fischer and Kennedy accepted the severance packages on March 23, 2012.

93.     As part of their severance packages, Fischer and Kennedy signed releases (the "March 2012 Releases").

94.     The terms of the March 2012 Releases provided, in relevant part, that:

> **B.** Employee and Company enter into this Agreement in order to resolve any and all issues that exist, or may in the future exist, between them arising from or relating to Employee's hire, employment and termination, and to preserve the goodwill existing between them.
> …
>
> **13. No Disparaging Conduct.**  Employee agrees and promises that he or she will not undertake any harassing or disparaging conduct directed at the Releases, and that he or she will refrain from making any negative, detracting, derogatory, and unfavorable statements about the Releases.  Employee further agrees and promises that he or she will not induce or incite claims of discrimination, harassment, retaliation, wrongful discharge, wage and hour and/or labor code violations, or any other claims against Employer, any subsidiary or affiliate of Employer, or any of its individual employees, shareholders. partners, members, officers, directors, or

18

agents by any other person.

**14. Confidential, Proprietary or Trade Information.**
*Employee promises and agrees that Employee shall not disclose any Confidential, Proprietary or Trade Information of Employer to any other person or entity. Employee further agrees not to use such Confidential, Proprietary or Trade Secret Information of Employer for any personal or business purpose.*

**15. Employer Property.** Employee hereby represents and warrants that on or before the date of Employee's separation, Employee will return to Employer all Employer property and copies thereof in Employee's custody, including, but not limited to, company-issued keys, the originals and copies of all business documents, computer software, print-outs, brochures, product information, personnel records, confidential proprietary management information, and any other documents related to Employer or its business.
…

**20. Conditions of Breach by Employee.** Employee specifically agrees that the Company's payments to Employee under this Agreement are made in return for Employee's obligations set forth in this Agreement. Employee further agrees that if he or she breaches any of the obligations set forth in this Agreement. Such a breach would cause harm to Employer and its business, for which Employer may recover damages.   (emphasis added)

95.    True and correct copies of the March 2012 Releases signed by Kennedy and Fischer are attached hereto as Exhibits 11 and 12.

96.    As part of their termination of employment, Fischer and Kennedy also signed Exit Agreements.

19

97.   Fischer signed the Exit Agreement on March 26, 2012.

98.   A true and correct copy of the Exit Agreement signed by Fischer is attached hereto as Exhibit 13; *see supra*, ¶ 68 for the relevant terms of the Exist Agreement.

99.   Kennedy signed the Exit Agreement on March 28, 2012.

100.   A true and correct copy of the Exit Agreement signed by Kennedy is attached hereto as Exhibit 14; *see supra*, ¶ 68 for the relevant terms of the Exist Agreement.

### iii)   Defendant Peggy T. Bates

101.   Upon information and belief, Defendant Bates was hired as a certified wound specialist in or around December 2006.

102.   From 2006 until 2012, one of Bates' immediate supervisor's was Defendant Meyers.

103.   In 2010, Bates held the position of clinical specialist and her responsibilities included interacting with staff members at various facilities in their respective territories and educating facility personnel regarding AMT's proprietary wound care techniques and documentation processes.

104.   Bates read and acknowledged to be bound by the terms of the AMT Employment Handbook.  *See* Exhibit 15.

105.   On December 7, 2010, Bates signed the Confidentiality Agreement.

106.   A true and correct copy of the Confidentiality Agreement signed by Bates is attached hereto as Exhibit 15; *see supra*, ¶ 53, for the relevant terms of the

Confidentiality Agreement.

107.   Bates handled AMT's relationships with customer facilities in the Illinois and Wisconsin markets.

108.   Bates had access to AMT confidential information including, but not limited to, patient information, customer lists, customer information, sales prospects, costs and pricing information, and information about the company's business, processes, and procedures.

109.   On September 17, 2012, against company policy, Bates submitted written notification of her resignation from AMT without providing the required two-week notice to AMT.

### F.   Meyers, Fischer, Kennedy, and Bates Begin Working for Defendant Gentell and Intentionally Interfering with AMT's Business Relationships.

110.   As part of Defendants' unlawful scheme, Gentell, Brotz, Fischer, Kennedy, and Meyers employed predatory recruiting tactics to gain a competitive advantage over AMT.

111.   Upon information and belief, Fischer and Kennedy began working for Gentell on or about May 30, 2012.

112.   By June 14, 2012, AMT also had been informed by an industry contact that Meyers had been hired by Gentell.

113.   Upon information and belief, Bates began working for Gentell on or about September 18, 2012.

114.   Gentell also is a provider of wound care supplies and services to

various facilities around the country, and is a direct competitor with AMT.

115.   Upon information and belief, beginning in June 2012, Gentell began using information and client relationships acquired from Meyers, Kennedy, Fischer, and/or Bates during their employment with AMT to deliberately spread misinformation regarding AMT, including, but not limited to, the reasons for AMT's Chapter 11 bankruptcy, in an effort to target and induce AMT's customer facilities to discontinue the services of AMT, and instead, retain the services of Gentell.

116.   Further, upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Kennedy, Fischer, and/or Bates used confidential and proprietary information, including, but not limited to, documents internally generated by AMT identifying AMT customers and AMT-specific customer pricing spreadsheets as part of Gentell's efforts to sabotage AMT's existing client facility customers.

### G.   AMT's BAAs with Prestige Health Care, Petersen Health Care, Tabor Hills Healthcare, Hillcrest Retirement Village, Jewish Home & Care Center, Evergreen Health Center, and St. Joseph's Home for the Aged.

#### i)   *Prestige Health Care*

117.   Prestige Health Care, LLC ("Prestige") operates sixteen (16) facilities in the upper Midwest, thirteen (13) of which were customer facilities that had signed BAAs with AMT.

118.   During the time period Meyers, Kennedy, and Fischer were employed by Gentell, AMT's direct competitor, Prestige informed AMT that it had decided to engage Gentell on a trial basis in three (3) of its facilities which had previously signed BAAs with AMT.

119.   On or about June 19th, 2012, Prestige provided written notification to AMT that it was terminating several existing BAAs with AMT.

120.   The three Prestige facilities which were lost by AMT to Gentell were the Strawberry Lane, Greystone Health Care, and Friendly Village facilities.

121.   On July 6, 2012, Brian R. Browning, Prestige's Director of Facilities and Materials Management, [SHM1], sent an email to Nancy McNally, Regional Manager at AMT, advising that Prestige must be assured that its vendor partners "will be with us for years to come."

122.   A true and correct copy of the July 6, 2012 Browning e-mail is attached hereto as Exhibit 16.

123.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy improperly provided false information to Prestige that caused Prestige to question AMT's long-term ability to continue as a viable company, as evidenced by the July 6, 2012 email, despite the Chapter 11 bankruptcy court's unequivocal approval to continue operations in the ordinary course.

124.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy falsely advised Prestige that:  (i) AMT's Chapter 11 bankruptcy will lead to AMT going out of business, thereby preventing AMT from providing continued services to its customer base; and (ii) that AMT's Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud.  Both statements were known to be false by Meyers, Fischer, and/or Kennedy and were knowingly contradicted by Medicare's March 9, 2012 decision to release funds to

23

pay a majority of AMT's claims.

125.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy used confidential proprietary trade secrets.

126.   As a direct consequence of Meyers, Fischer, and/or Kennedy's unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

### ii)   *Petersen Heath Care*

127.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy also contacted staff members and managers at Petersen Health Care ("Petersen") in an effort to convince Petersen to select Gentell over AMT.

128.   Sixty-nine Petersen facilities in Illinois are currently parties to valid and existing BAAs with AMT.

129.   Petersen was one of Meyers' largest accounts while she was employed by AMT and, upon information and belief, she solicited executives and managers at Petersen's corporate headquarters to obtain Petersen's retention of Gentell's services.

130.   Similarly, upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Fischer and Kennedy solicited managers and staff members at Petersen's individual facilities with the same goal.

131.   Upon information and belief, as part of Defendants' ongoing scheme

24

to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy told Petersen that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

132.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy used confidential proprietary trade secrets.

133.   It was not until as late as August 8, 2012, and after days of difficult negotiations with Petersen executives, that AMT received confirmation that Petersen would *likely* remain a customer of AMT.

134.   Meyers has not ceased her attempts to induce Petersen executives and managers to discontinue their services with AMT and retain Gentell.

135.   In September 2012, at a trade show in Illinois, Meyers advised AMT's Chief Medical Officer she was "getting," among other facilities, Petersen.

136.   On September 26, 2012, AMT received written notification that Petersen was terminating its BAA with AMT.

### iii)   *Tabor Hills Healthcare Facility*

137.   Tabor Hills Healthcare Facility ("Tabor") is a healthcare and rehabilitation center located in Naperville, Illinois.  AMT formerly enjoyed a trusted and valued relationship with Tabor.

138.   Upon information and belief, in July 2012, as part of Defendants'

25

ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy contacted staff members and managers at Tabor in an effort to induce Tabor to discontinue business with AMT and retain Gentell.

139.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy told Tabor that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

140.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Meyers, Fischer, and/or Kennedy used confidential proprietary trade secrets.

141.   As a direct result of the foregoing actions of Meyers, Fischer, and/or Kennedy, on July 27, 2012, Tabor's Director of Nursing, Debbie Harvat, emailed AMT wound care specialist, Carol Curry, and advised that Tabor was terminating its BAA with AMT, effective immediately.

142.   As a direct consequence of Meyers, Fischer, and/or Kennedy's unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

### iv.   *HillCrest Retirement Village*

143.   HillCrest Retirement Village ("HillCrest") is a healthcare and rehabilitation center located in Round lake Beach, Illinois.  AMT formerly enjoyed a trusted and valued relationship with HillCrest.

144.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Defendants solicited Bates to terminate her employment with AMT to work for Gentell.

145.   Upon information and belief, in September 2012, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, while still employed by AMT, Bates contacted staff members and managers at HillCrest in an effort to induce HillCrest to select Gentell over AMT.

146.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Bates told HillCrest that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

147.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Bates used confidential proprietary trade secrets.

148.   As a direct result of the foregoing actions of Bates, on September 18, 2012, HillCrest's administrator, Alan Rosenbaum, called AMT's Regional Manager, Candace Harness, and advised that HillCrest was terminating its BAA with AMT, effective immediately.

149.   As a direct consequence of Bates' unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

27

### v.    *Jewish Home & Care Center*

150.   The Jewish Home & Care Center ("JHCC") is a healthcare and rehabilitation center located in Milwaukee, Wisconsin.  AMT formerly enjoyed a trusted and valued relationship with JHCC.

151.   Upon information and belief, in or around August 2012, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, while still employed by AMT, Bates contacted staff members and managers at JHCC in an effort to induce JHCC to select Gentell over AMT.

152.   Upon information and belief, Bates told JHCC that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

153.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Bates used confidential proprietary trade secrets.

154.   As a direct result of the foregoing actions of Bates, on August 29, 2012, JHCC advised AMT that JHCC was terminating its BAA with AMT, effective immediately.

155.   As a direct consequence of Bates' unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

### vi.    *Evergreen Health Center*

156.   Evergreen Health Center ("Evergreen") is a nursing care facility

28

located in Oshkosh, Wisconsin. AMT formerly enjoyed a trusted and valued relationship with Evergreen.

157.   Upon information and belief, in or around September 2012, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Fischer contacted staff members and managers at Evergreen in an effort to induce Evergreen to select Gentell over AMT.

158.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Fischer told Evergreen that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

159.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Fischer used confidential proprietary trade secrets.

160.   As a direct result of the foregoing actions of Fischer, on September 12, 2012, Evergreen advised AMT that it was terminating its BAA with AMT, effective immediately.

161.   As a direct consequence of Fischer's unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

### vii.   *St Joseph's Home for the Aged*

162.   St. Joseph's Home for the Aged ("St. Joseph's") is a nursing care and

rehabilitation facility located in Kenosha, Wisconsin. AMT formerly enjoyed a trusted and valued relationship with St. Joseph's.

163.   Upon information and belief, in September 2012, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, while still employed by AMT, Bates contacted staff members and managers at St. Joseph's in an effort to induce St. Joseph's to select Gentell over AMT.

164.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Bates told St. Joseph's that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

165.   As a direct result of the foregoing actions of Bates, on September 18, 2012, St. Joseph's advised AMT that it was terminating its BAA with AMT, effective immediately.

166.   As a direct consequence of Bates' unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

167.   As a result of the aforementioned acts by Defendants, individually and in concert, AMT seeks, *inter alia*, an order of judgment awarding AMT relief in the form of compensatory damages, punitive damages, injunctive relief, and any further relief this Count may find appropriate.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
### (Against Defendant Brotz)

168.   Paragraphs 1 to 167 are incorporated herein by reference.

169.   Contractual relationships, represented by valid and enforceable BAAs, existed between AMT and its various customer facilities, including those operated by Prestige, Petersen, CPS, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

170.   Upon information and belief, Brotz, as the highest-ranking officer of Gentell, a competitor of AMT, was aware of those contractual relationships through direct communications with Defendants Meyers, Kennedy, Fischer, and/or Bates.

171.   Brotz, as the highest-ranking officer of Gentell, caused Gentell and its agents, including former employees of AMT such as Meyers, Kennedy, Fischer, and/or Bates, to tortiously interfere with AMT's valid and existing contractual relationships.

172.   Brotz employed tactics such as predatory recruiting with the goal of destroying AMT's valued and trusted relationships with its customer facilities.

173.   Brotz was aware that Meyers, Kennedy, Fischer, and/or Bates owed a duty of confidentiality to AMT regarding information learned while working for AMT.

174.   Brotz induced Meyers, Kennedy, Fischer, and/or Bates to share information with Brotz including, but not limited to, AMT's customers, AMT customer information, sales prospects, AMT-specific pricing lists, and information

31

about AMT's business, processes, and procedures.

175.   Additionally, Brotz's interference included, *inter alia*, falsely representing to AMT's customer facilities that AMT's voluntary Chapter 11 bankruptcy filing meant that AMT would cease to operate as a going concern, and that the bankruptcy filing was related to wrongdoing and misconduct such as Medicare fraud.

176.   Upon information and belief, these misrepresentations by Brotz and the other Defendants induced and ultimately caused AMT's customers to explore termination of BAAs they had signed with AMT.

177.   Upon information and belief, at least three facilities operated by Prestige terminated their BAAs with AMT as a result of Brotz's interference, including, but not limited to, the Strawberry Lane facility, Greystone Health Care facility, and the Friendly Village facility.

178.   Upon information and belief, Petersen was induced to terminate its BAA with AMT as a result of Brotz's interference.

179.   Upon information and belief, Tabor was induced to terminate its BAA with AMT as a result of Brotz's interference.

180.   Upon information and belief, HillCrest was induced to terminate its BAA with AMT as a result of Brotz's interference.

181.   Upon information and belief, JHCC was induced to terminate its BAA with AMT as a result of Brotz's interference.

182.   Upon and information and belief, Evergreen was induced to terminate its BAA with AMT as a result of Brotz's interference.

183.   Upon information and belief, St. Joseph's was induced to terminate its BAA with AMT as a result of Brotz's interference.

184.   Further, as evidenced by his admitted fabrication of the May 9 Letter purporting to fraudulently terminate the BAA between CPS and AMT, Brotz willfully and maliciously intended to cause harm to AMT by tortiously interfering with AMT's contractual relationships.

185.   Brotz, as the highest-ranking officer of Gentell, a competitor to AMT, did not have privilege or justification to interfere with AMT's contractual relationships, including those with Prestige, Petersen, CPS, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

186.   Brotz's actions in using his position as the highest-ranking officer of Gentell to tortiously interfere with AMT's contractual relationships has caused real and actual damages to AMT, including, but not limited to, termination of AMT's BAAs with Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

187.   As a result of the tortious interference by Brotz, AMT has sustained real and actual damages because AMT would have received the economic benefit of its customers' business in the absence of the tortious interference, in addition to damage to AMT's goodwill.

188.   Further, because Brotz's actions were committed willfully, maliciously or so carelessly as to indicate wanton disregard for the rights of AMT, as evidenced by the fabrication and transmission of the fraudulent May 9 Letter purporting to be from a customer of AMT, punitive damages are appropriate under Pennsylvania law.

33

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
### (Against Gentell, Meyers, Kennedy, Fischer, and Bates)

189.   Paragraphs 1 to 188 are incorporated herein by reference.

190.   Contractual relationships, represented by valid and enforceable BAAs, existed between AMT and its various customer facilities, including those operated by Prestige, Petersen, CPS, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

191.   Gentell, Meyers, Kennedy, and/or Fischer employed tactics such as predatory recruiting with the goal of destroying AMT's valued and trusted relationships with its customer facilities.

192.   Upon information and belief, Gentell, through Brotz, was aware that Meyers, Kennedy, Fischer, and/or Bates owed a duty of confidentiality to AMT regarding information learned while working for AMT.

193.   Upon information and belief, Gentell, through Brotz, induced Meyers, Kennedy, Fischer, and/or Bates to share information with Gentell, including but not limited to, AMT's customers, AMT customer information, sales prospects, AMT-specific pricing lists, and information about AMT's business, processes, and procedures.

194.   Upon information and belief, Meyers was aware Kennedy, Fischer, and/or Bates owed a duty of confidentiality to AMT regarding information learned while working for AMT.

195.   Upon information and belief, Meyers induced Kennedy, Fischer, and/or Bates to share information including, but not limited to, AMT's customers, AMT customer information, sales prospects, AMT-specific pricing lists, and

34

information about AMT's business, processes, and procedures.

196.    Upon information and belief, Kennedy and/or Fischer were aware that Bates owed a duty of confidentiality to AMT regarding information learned while working for AMT.

197.    Upon information and belief, Kennedy and/or Fischer induced Bates to share information including, but not limited to, AMT's customers, AMT customer information, sales prospects, AMT-specific pricing lists, and information about AMT's business, processes, and procedures.

198.    Upon information and belief, Gentell, through its agents, including Meyers, Kennedy, Fischer, and/or Bates, also unlawfully interfered with AMT's contractual relationships with its customer facilities by, *inter alia*, falsely representing to AMT's customer facilities that AMT's voluntary Chapter 11 bankruptcy filing meant that AMT would cease to operate as a going concern, and that the filing was related to wrongdoing and misconduct such as Medicare fraud.

199.    Upon information and belief, these misrepresentations by Gentell, Meyers, Kennedy, Fischer, and/or Bates induced and caused AMT's customers to explore termination of BAAs they had signed with AMT.

200.    Upon information and belief, at least three facilities operated by Prestige terminated their BAAs with AMT as a result of the unlawful interference from Gentell, Meyers, Kennedy, and/or Fischer, including, but not limited to, the Strawberry Lane facility, Greystone Health Care facility, and the Friendly Village facilities.

201.    Upon information and belief, Peterson was induced to terminate its BAA with AMT as a result of the unlawful interference from Gentell and

Defendants.

202.    Upon information and belief, Tabor was induced to terminate its BAA with AMT as a result of unlawful interference from Gentell, Meyers, Kennedy, and/or Fischer.

203.    Upon information and belief, HillCrest was induced to terminate its BAA with AMT as a result of the unlawful interference from Gentell and Bates.

204.    Upon information and belief, JHCC was induced to terminate its BAA with AMT as a result of the unlawful interference from Gentell and Bates.

205.    Upon information and belief, Evergreen was induced to terminate its BAA with AMT as a result of the unlawful interference from Gentell and Fischer.

206.    Upon information and belief, St. Joseph's was induced to terminate its BAA with AMT as a result of unlawful interference from Gentell and Bates.

207.    Meyers, Kennedy, and Fischer, as a result of their termination by AMT, intended to cause harm to AMT by unlawfully interfering with AMT's contractual relationships.

208.    Bates intended to cause harm to AMT by unlawfully interfering with AMT's contractual relationships.

209.    Gentell, as a competitor to AMT, as well as Meyers, Kennedy, Fischer, and Bates, as former employees of AMT, did not have privilege or justification to unlawfully interfere with AMT's contractual relationships, including those with Prestige, Petersen, CPS, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

36

210.   The unlawful interference with AMT's contractual relationships by Gentell, Meyers, Kennedy, Fischer, and/or Bates, has caused real and actual damages to AMT, including, but not limited to, termination of AMT's BAAs with Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

211.   As a result of the unlawful interference by Gentell, Meyers, Kennedy, Fischer, and/or Bates, AMT has sustained real and actual damages because AMT would have received the economic benefit of its customers' business in the absence of the unlawful interference.

212.   Gentell is vicariously liable for the unlawful actions of Meyers, Kennedy, Fischer, and/or Bates.

213.   Further, because the actions of Gentell, Meyers, Kennedy, Fischer, and/or Bates were committed willfully, maliciously or so carelessly as to indicate wanton disregard for the rights of AMT, punitive damages are appropriate under Pennsylvania law.

## COUNT III
## DEFAMATION
**(Against Gentell, Brotz, Meyers, Kennedy, Fischer, and Bates)**

214.   Paragraph 1 to 213 are incorporated herein by reference.

215.   AMT enjoys a trusted and valuable relationship with Prestige.

216.   On June 14, 2012, Prestige informed AMT that it had decided to engage Gentell on a trial basis in three (3) of its facilities which had previously signed BAAs with AMT.

217.   On or about June 19, 2012, Prestige provided written notification to AMT that it was terminating several existing BAAs with AMT.

37

218.    The three Prestige facilities which were lost by AMT to Gentell were the Strawberry Lane, Greystone Health Care, and Friendly Village facilities.

219.    On July 6, 2012, Brian R. Browning, Prestige's Director of Facilities and Materials Management, sent an email to Nancy McNally, Regional Manager at AMT, advising that Prestige must be assured that its vendor partners "will be with us for years to come." *See* Exhibit 16.

220.    Upon information and belief, Brotz, Meyers, Fischer, and/or Kennedy improperly provided false information to Prestige that caused Prestige to question AMT's long-term ability to continue as a viable company, as evidenced by the July 6, 2012 email, despite the Chapter 11 bankruptcy court's unequivocal approval to continue operations in the ordinary course.

221.    Upon information and belief, Brotz, Meyers, Fischer, and/or Kennedy falsely advised Prestige that:  (i) AMT's Chapter 11 bankruptcy will lead to AMT going out of business, thereby preventing AMT from providing continued services to its customer base; and (ii) that AMT's Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud.  Both statements were known to be false by Meyers, Fischer, and/or Kennedy and were knowingly contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

222.    As a direct consequence of Brotz, Meyers, Fischer, and/or Kennedy's unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

223.    Upon information and belief, Meyers, Fischer and/or Kennedy solicited managers and staff members at Petersen's individual facilities to obtain Petersen's retention of Gentell's services.

224.   Upon information and belief, Meyers, Fischer, and/or Kennedy told Petersen that AMT's Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

225.   On September 26, 2012, AMT received written notification that Petersen was terminating its BAA with AMT.

226.   Upon information and belief, in July 2012, Meyers, Fischer, and/or Kennedy solicited staff members and managers at Tabor in an effort to induce Tabor to select Gentell over AMT.

227.   Upon information and belief, Meyers, Fischer, and/or Kennedy told Tabor that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

228.   As a direct result of the foregoing actions of Meyers, Fischer, and/or Kennedy, on July 27, 2012, Tabor's Director of Nursing, Debbie Harvat, emailed AMT wound care specialist, Carol Curry, and advised that Tabor was terminating its BAA with AMT, effective immediately.

229.   As a direct consequence of Meyers', Fischer's, and/or Kennedy's unlawful actions, AMT suffered actual damages in the form of lost profits and lost goodwill.

230.   Upon information and belief, in September 2012, Bates, while still

employed at AMT, solicited staff members and managers at HillCrest in an effort to induce HillCrest to select Gentell over AMT.

231.   Upon information and belief, Bates, while still employed by AMT, told HillCrest that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

232.   Upon information and belief, Bates, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, used confidential proprietary trade secrets.

233.   As a direct result of the foregoing actions of Bates, on September 18, 2012, HillCrest's administrator, Alan Rosenbaum, called AMT's Regional Manager, Candace Harness, and advised that HillCrest was terminating its BAA with AMT, effective immediately.

234.   As a direct consequence of Bates' unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

235.   Upon information and belief, in or around August 2012, while still employed by AMT, Bates contacted staff members and managers at JHCC in an effort to induce JHCC to select Gentell over AMT.

236.   Upon information and belief, Bates told JHCC that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to

release funds to pay a majority of AMT's claims.

237.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Bates used confidential proprietary trade secrets.

238.   As a direct result of the foregoing actions of Bates, on August 29, 2012, JHCC advised AMT that JHCC was terminating its BAA with AMT, effective immediately.

239.   As a direct consequence of Bates' unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

240.   Upon information and belief, in or around September 2012, Fischer contacted staff members and managers at Evergreen in an effort to induce Evergreen to select Gentell over AMT.

241.   Upon information and belief, Fischer told Evergreen that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

242.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Fischer used confidential proprietary trade secrets.

243.   As a direct result of the foregoing actions of Fischer, on September 12, 2012, Evergreen advised AMT that it was terminating its BAA with AMT, effective immediately.

41

244.   As a direct consequence of Fischer's unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

245.   Upon information and belief, in September 2012, Bates, while still employed at AMT, solicited staff members and managers at St. Joseph's in an effort to induce St. Joseph's to select Gentell over AMT.

246.   Upon information and belief, Bates told St. Joseph's that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

247.   Upon information and belief, as part of Defendants' ongoing scheme to destroy AMT's business relations and corporate goodwill, Bates used confidential proprietary trade secrets.

248.   As a direct result of the foregoing actions of Bates, on September 18, 2012, St. Joseph's advised AMT that it was terminating its BAA with AMT, effective immediately.

249.   As a direct consequence of Bates' unlawful action, AMT suffered actual damages in the form of lost profits and lost goodwill.

250.   Gentell is vicariously liable for the unlawful actions of Meyers, Kennedy, Fischer, and Bates.

251.   Further, because Gentell's, Meyers', Kennedy's, Fischer's, and/or Bates' actions were committed willfully, maliciously and so carelessly as to indicate wanton disregard for the rights of AMT, punitive damages are appropriate

under Pennsylvania law.

## COUNT IV
## CONVERSION
### (Against Gentell, Brotz, Meyers, Kennedy, Fischer, and Bates)

252. Paragraphs 1 to 251 are incorporated herein by reference.

253. Pennsylvania recognizes a claim for conversion of business information.

254. Meyers, Kennedy, Fischer and Bates had access to AMT's confidential information including, but not limited to, patient information, customer lists, customer information, sales prospects, costs and pricing information, and information about the company's business, processes, and procedures.

255. Despite being suspended from AMT on May 16, 2012, Meyers continued to have access to her e-mail account at AMT until May 23, 2012, and used that time to forward, without authorization, a substantial number of proprietary files from her AMT e-mail account to her personal e-mail account, including, but not limited to, AMT generated sales reports related to individual AMT customer facilities and AMT customer lists. These highly confidential and proprietary reports provide the precise costs for certain wound care supplies provided to AMT customer facilities.

256. These spreadsheets are extremely valuable to AMT, as the information provided therein evidence cost savings provided to individual customer facilities, as well as the value AMT attributes to each customer facilities – based on number of supplies ordered and purchased by AMT's customer facilities.

257.   Additionally, during this time, Meyers also improperly forwarded at least one document containing confidential and/or proprietary information to Kennedy.

258.   Upon information and belief, Gentell, Brotz, Meyers, Kennedy, Fischer, and/or Bates used confidential and proprietary information such as AMT customer lists, AMT-specific pricing spreadsheets, and information about the company's business, processes and procedures to sabotage AMT's business, and destroy AMT's contractual relations.

259.   AMT did not consent to Brotz's, Meyers', Kennedy's, Fischer's, and/or Bates' use of its confidential and proprietary information.

260.   As former employees of AMT, Meyers, Kennedy, Fischer, and Bates did not have a privilege or justification to use AMT's confidential and proprietary information.

261.   Brotz, as the highest-ranking officer of Gentell, a competitor to AMT, did not have privilege or justification to AMT's confidential and proprietary information.

262.   As a result of the unlawful conversion, AMT has sustained real and actual damages, including, but not limited to, the lost profits generated by AMT from Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's because AMT would have received the economic benefit of its customers' business in the absence of the conversion, as well as the loss of AMT's goodwill.

263.   Gentell is vicariously liable for the unlawful actions of Brotz's Meyers, Kennedy, Fischer, and Bates.

264.   Further, because Brotz's, Meyers', Kennedy's, Fischer's, and Bates' actions were committed willfully, maliciously or so carelessly as to indicate wanton disregard for the rights of AMT, punitive damages are appropriate under Pennsylvania law.

## COUNT V
## CONSPIRACY
### (Against All Defendants)

265.   Paragraphs 1 to 264 are incorporated herein by reference.

266.   Meyers, Kennedy, Fischer, and Bates, upon being hired by Gentell, conspired with Gentell and Brotz, as Gentell's highest-ranking officer, to unlawfully and tortiously interfere with AMT's contractual relationships in violation of Pennsylvania law.

267.   Defendants committed an overt act of conspiracy by:

    a.    fraudulently transmitting the May 9 Letter;

    b.    employing predatory recruiting tactics;

    c.    misrepresenting to AMT's customers AMT's ability to remain as a going concern;

    d.    falsely representing that AMT's Chapter 11 bankruptcy filing was related to misconduct or wrongdoing; and

    e.    improperly using confidential information obtained from AMT in an effort to target AMT customers for the benefit of Gentell, a direct competitor of AMT.

268.   Because Defendants were either competitors or former employees of AMT, Defendants were not privileged or justified to unlawfully interfere with AMT's contractual relationships.

269.   Defendants' unlawful interference with AMT's contractual relationships, effectuated through conspiracy with each other in violation of Pennsylvania law, has caused real and actual damages to AMT, including, but not limited to, termination of AMT's BAAs with Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's, as well as loss of AMT's goodwill.

270.   Further, because Defendants' actions were committed willfully, maliciously or so carelessly as to indicate wanton disregard for the rights of the injured party, as evidenced by the fabrication and transmission of the fraudulent May 9 Letter, punitive damages are appropriate under Pennsylvania law.  For instance, the May 9 Letter, which was improperly fabricated by Gentell and/or Brotz and which Brotz admitted to sending, is proof of malice and intent to injure.

### COUNT VI
### VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT
### (Against Meyers, Fischer, Kennedy, Bates, and Gentell)

271.   Paragraphs 1 to 270 are incorporated herein by reference.

272.   Meyers signed the WCA on December 4, 2004, in which she agreed to, *inter alia*: not to disclose or use any confidential proprietary information to any person, company, or entity outside of the AMT office without management's approval, including unauthorized transmission via computer.

273.   Meyers read and acknowledged to be bound by the terms of AMT's Employee Handbook.

274.   Meyers signed the Confidentiality Agreement on December 7, 2010, in which she similarly agreed not to disclose or use any confidential proprietary information.

46

275.   Meyers signed the AMT Exit Agreement on May 31, 2012, in which she again agreed not to disclose or use any confidential proprietary information.

276.   Accordingly, Meyers had a duty to maintain secrecy regarding AMT's confidential and proprietary information.

277.   Kennedy signed the WCA on September 12, 2006, in which she agreed to, *inter alia*: not to disclose or use any confidential proprietary information to any person, company, or entity outside of the AMT office without management's approval, including unauthorized transmission via computer.

278.   Kennedy read and acknowledged to be bound by the terms of AMT's Employee Handbook.

279.   Kennedy signed the Confidentiality Agreement on December 9, 2010, in which she similarly agreed not to disclose or use any confidential proprietary information.

280.   In March 2012, Kennedy signed a release in which she agreed, among other things, not to disclose or use any AMT confidential proprietary information.

281.   Kennedy signed the AMT Exit Agreement on March 28, 2012, in which she again agreed not to disclose or use any confidential proprietary information.

282.   Accordingly, Kennedy had a duty to maintain secrecy regarding AMT's confidential and proprietary information.

283.   Fischer signed the WCA on September 28, 2007, in which she agreed to, *inter alia*: not to disclose or use any confidential proprietary information to any person, company, or entity outside of the AMT office without management's

47

approval, including unauthorized transmission via computer.

284.   Fischer read and acknowledged to be bound by the terms of AMT's Employee Handbook.

285.   Fischer signed the Confidentiality Agreement on December 8, 2010, in which she similarly agreed not to disclose or use any confidential proprietary information.

286.   In March 2012, Fischer signed a release in which she agreed, among other things, not to disclose or use any AMT confidential proprietary information.

287.   Fischer signed the AMT Exit Agreement on March 26, 2012, in which she again agreed not to disclose or use any confidential proprietary information.

288.   Accordingly, Fischer had a duty to maintain secrecy regarding AMT's confidential and proprietary information.

289.   Bates read and acknowledged to be bound by the terms of AMT's Employee Handbook.

290.   Bates signed the Confidentiality Agreement on December 7, 2010, in which she agreed not to disclose or use any confidential proprietary information.

291.   Accordingly, Bates had a duty to maintain secrecy regarding AMT's confidential and proprietary information.

292.   Meyers was suspended from AMT on May 16, 2012.  Despite this suspension, Meyers continued to have access to her e-mail account at AMT until May 23, 2012, and used that time to forward, without authorization, a substantial number of proprietary files from her AMT e-mail account to her personal e-mail

account, including, but not limited to, AMT generated documents identifying AMT customers and AMT-specific customer pricing spreadsheets.

293.   These highly confidential and proprietary reports provide the precise costs for certain wound care supplies provided to AMT customer facilities.

294.   Additionally, these reports are extremely valuable to AMT, as the information provided therein evidence cost savings provided to individual customer facilities, as well as the value AMT attributes to each customer facilities – based on number of supplies ordered and purchased by AMT's customer facilities.

295.   Upon information and belief, Meyers also improperly forwarded these reports to Kennedy for Gentell's competitive advantage.

296.   AMT did not consent to Meyers' disclosure of its confidential and proprietary information.

297.   Kennedy and Gentell, upon acquisition of AMT's confidential and proprietary information improperly obtained by Meyers, has caused real and actual damages to AMT.  Specifically, this misappropriation of AMT's confidential and proprietary information has caused real and actual damages to AMT, including, but not limited to, termination of AMT's BAAs with Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's, as well as loss of goodwill.

298.   Gentell is vicariously liable for the unlawful actions of Meyers and/or Kennedy.

299.   Further, because these actions were committed willfully, maliciously or so carelessly as to indicate wanton disregard for the rights of the injured party,

exemplary damages are appropriate under Pennsylvania law.

**COUNT VII**
**BREACH OF CONTRACT**
**(Against Meyers, Kennedy, Fischer, and Bates)**

300.   Paragraphs 1 to 299 are incorporated herein by reference.

301.   Meyers, Kennedy, and Fischer each voluntarily signed the WCA, in which they agreed to, *inter alia*: refrain from disclosing or making unauthorized transmissions or disclosure of confidential proprietary information from AMT to unauthorized locations; and return all documents to AMT.

302.   Meyers, Kennedy, Fischer, and Bates each read and acknowledged to be bound by the terms of AMT's Employee Handbook.

303.   Meyers, Kennedy, Fischer, and Bates each voluntarily signed AMT's Confidentiality Agreements in which they similarly agreed not to disclose any confidential proprietary information.

304.   Fischer and Kennedy each signed and executed the March 2012 Releases, in which they agreed to, *inter alia*: refrain from making any disparaging statements regarding AMT; refrain from using any confidential, propriety or trade secret information of AMT for any personal or business purpose; return all property and copies of business documents, print-outs, brochures, product information, confidential proprietary information, and any other documents related to AMT or its business.

305.   Further, the 2012 Releases specifically provide that AMT may recover damages in the event any of the obligations are breached by either Fischer or Kennedy.

50

306.   In addition, Meyers, Kennedy, and Fischer each voluntarily signed and executed the Exit Agreement, in which each agreed to "preserve as confidential and not use, for the benefit of myself or others, any confidential information, customer lists, product designs, processes, or other information that has now or could in the future have economic value to the company."

307.   The Exit Agreement also bound Meyers, Kennedy, and Fischer to uphold their obligations under the Confidentiality Agreements, which included, *inter alia*, confidentiality and non-competition provisions.

308.   Specifically, the Exit Agreements, through references to the respective Confidentiality Agreements, prohibited Meyers, Kennedy, and Fischer from "rendering services related to wound prevention or treatment to any Client" after termination of their employment.

309.   Thus, Meyers, Kennedy, and Fischer had and continue to have an affirmative duty to refrain from assisting Gentell serve current or former customer facilities of AMT.

310.   Upon information and belief, Meyers, Kennedy, and Fischer have, through their employment with Gentell, rendered services related to wound prevention or treatment to AMT's customer facilities, including those operated by Prestige.

311.   Further, Meyers, Kennedy, and Fischer have used confidential customer lists in breach of their obligations pursuant to the Exit Agreement, and have disclosed the contents of those lists to Gentell, AMT's direct competitor, in direct violation of the WCA, the Confidentiality Agreement, the 2012 Releases, and the Exit Agreement.

312.   Meyers used AMT's computer systems, prior to her final termination on May 25, 2012, to transmit confidential proprietary information to her personal e-mail account for later use during her employment with Gentell.

313.   Such provision of services and theft and disclosure of confidential proprietary information constitutes a breach of contractual obligations owed to AMT.

314.   Meyers, Kennedy, Fischer, and/or Bates violated their duty of loyalty to AMT by contacting staff members and managers at, among others unknown at this time, Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's and disseminating false information regarding AMT's Chapter 11 bankruptcy.

315.   Upon information and belief, Meyers, Fischer, Kennedy, and/or Bates told Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's that the Chapter 11 bankruptcy will lead to AMT going out of business, as well as that the Chapter 11 bankruptcy was related to wrongdoing or misconduct, such as Medicare fraud, both of which are untrue and contradicted by Medicare's March 9, 2012 decision to release funds to pay a majority of AMT's claims.

316.   As a direct result of the foregoing actions of Meyers, Fischer, Kennedy, and/or Bates, Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's terminated their respective BAA's with AMT.

317.   As a direct consequence of Meyers', Fischer's, Kennedy's, and Bates' unlawful action, AMT suffered actual damages in the form of lost profits, and goodwill.

318.   Meyers', Kennedy's, Fischer's, and Bates' breach of their contractual obligations has caused real and actual harm to AMT, which has suffered

52

termination by Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's, which represent hundreds of thousands of dollars in actual lost profits in addition to loss of goodwill.

### COUNT VII
### COMMON LAW UNFAIR COMPETITION
**(Against all Defendants)**

319.   Paragraphs 1 to 318 are incorporated herein by reference.

320.   Contractual relationships, represented by valid and enforceable BAAs, existed between AMT and its various customer facilities, including those operated by Prestige, Petersen, CPS, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

321.   Brotz, as the highest-ranking officer of Gentell, caused Gentell and its agents, including former employees of AMT such as Meyers, Kennedy, Fischer, and/or Bates, to unlawfully interfere with AMT's valid and existing contractual relationships.

322.   Gentell, Brotz, Meyers, Kennedy, and/or Fischer employed tactics such as predatory recruiting with the goal of destroying AMT's valued and trusted relationships with its customer facilities.

323.   Upon information and belief, Gentell, through Brotz was aware that Meyers, Kennedy, Fischer, and/or Bates owed a duty of confidentiality to AMT regarding information learned while working for AMT.

324.   Upon information and belief, Gentell, through Brotz, induced Meyers, Kennedy, Fischer, and/or Bates to share information with Brotz including, but not limited to, AMT's customers, AMT customer information, sales prospects, AMT-specific pricing lists, and information about AMT's business, processes, and

53

procedures.

325.   Upon information and belief, Meyers induced Kennedy, Fischer, and/or Bates to share information including, but not limited to, AMT's customers, AMT customer information, sales prospects, AMT-specific pricing lists, and information about AMT's business, processes, and procedures.

326.   Upon information and belief, Kennedy and/or Fischer induced Bates to share information including, but not limited to, AMT's customers, AMT customer information, sales prospects, AMT-specific pricing lists, and information about AMT's business, processes, and procedures.

327.   Upon information and belief, Gentell, through its agents, including Meyers, Kennedy, Fischer, and Bates, also unlawfully interfered with AMT's contractual relationships with its customer facilities by, *inter alia*, falsely representing to AMT's customer facilities that AMT's voluntary Chapter 11 bankruptcy filing meant that AMT would cease to operate as a going concern, and that the filing was related to wrongdoing and misconduct such as Medicare fraud.

328.   Upon information and belief, these misrepresentations by Gentell, Brotz, Meyers, Kennedy, Fischer, and/or Bates induced and caused AMT's customers to explore termination of BAAs they had signed with AMT.

329.   Upon information and belief, at least three facilities operated by Prestige terminated their BAAs with AMT as a result of the unlawful interference from Gentell, Brotz, Meyers, Kennedy, and Fischer, including, but not limited to, the Strawberry Lane facility, Greystone Health Care facility, and the Friendly Village facilities.

330.   Upon information and belief, Peterson was induced to terminate its

54

BAA with AMT as a result of Defendants' unlawful interference.

331.   Upon information and belief, Tabor was induced to terminate its BAA with AMT as a result of Defendants' unlawful interference.

332.   Upon information and belief, HillCrest was induced to terminate its BAA with AMT as a result of Defendants' unlawful interference.

333.   Upon information and belief, JHCC was induced to terminate its BAA with AMT as a result of Defendants' unlawful interference.

334.   Upon information and belief, Evergreen was induced to terminate its BAA with AMT as a result of Defendants' unlawful interference.

335.   Upon information and belief, St. Joseph's was induced to terminate its BAA with AMT as a result of Defendants' unlawful interference.

336.   Meyers, Kennedy, Fischer, and Bates intended to cause harm to AMT by unlawfully interfering with AMT's contractual relationships.

337.   Gentell and Brotz, as competitors to AMT, as well as Meyers, Kennedy, Fischer, and Bates, as former employees of AMT, did not have privilege or justification to unlawfully interfere with AMT's contractual relationships, including those with Prestige, Petersen, CPS, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

338.   The unlawful interference with AMT's contractual relationships by Gentell, Brotz, Meyers, Kennedy, Fischer, and/or Bates, has caused real and actual damages to AMT, including, but not limited to, termination of AMT's BAAs with Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

339.    Further, as evidenced by his admitted fabrication of the May 9 Letter purporting to fraudulently terminate the BAA between CPS and AMT, Brotz intended to cause harm to AMT by unlawfully interfering with AMT's contractual relationships.

340.    Brotz, as the highest-ranking officer of Gentell, a competitor to AMT, did not have privilege or justification to interfere with AMT's contractual relationships, including those with Prestige, Petersen, CPS, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

341.    Brotz's actions in using his position as the highest-ranking officer of Gentell to unlawfully interfere with AMT's contractual relationships has caused real and actual damages to AMT, including, but not limited to, termination of AMT's BAAs with Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's.

342.    Defendants' conversion of AMT's confidential and proprietary business information violates Pennsylvania's common law tort of unfair competition.

343.    Meyers, Kennedy, Fischer, and/or Bates breached their contractual obligations to AMT in violation of Pennsylvania's common law tort of unfair competition.

344.    As a result of the foregoing actions, AMT has sustained real and actual damages, including, but not limited to, the lost profits generated by AMT from Prestige, Petersen, Tabor, HillCrest, JHCC, Evergreen, and St. Joseph's because AMT would have received the economic benefit of its customers' business in the absence of the unfair business practices employed by Defendants, as well as

loss of goodwill.

345.   Further, because Defendants' actions were committed willfully, maliciously or so carelessly as to indicate wanton disregard for the rights of AMT, punitive damages are appropriate under Pennsylvania law.

WHEREFORE, American Medical Technologies requests that this Honorable Court enter judgment in its favor and against Defendant on the Complaint and award Plaintiff damages in the form of compensatory damages, attorneys' fees, and punitive damages.  Further, AMT seeks an Order from the Court enjoining Defendants from employing tactics such as predatory recruiting, disseminating false information regarding AMT's business posture, and using confidential proprietary information unlawfully obtained by Defendants.  Lastly, AMT seeks any other relief that this Honorable Court deems appropriate.

Respectfully submitted:

Date:  October  /, 2012

David J. Kessler, Esq. (PA 81551)
dkessler@fulbright.com

FULBRIGHT & JAWORSKI LLP
666 Fifth Avenue
New York, New York  10103
Tel: 212-318-3000
Fax: 212-318-3400

Counsel for Plaintiff *Gordian Medical, Inc. d/b/a American Medical Technologies*

# EXHIBIT 1

Received on
5/9/2012
4:29:11 PM

**CPS Services**
**340 West Passaic Street**
**First Floor**
**Rochelle Park, New Jersey 07662**
**Tel. 201-368-9500**
**Fax. 201-368-0271**

May 9, 2012

*Via facsimile & First Class Mail*
Gordian Medical dba
American Medical Technologies
17595 Cartwright Road
Irvine, CA 92614

Dear AMT:

Please accept this letter as notice of our intend to terminate your services provided to our facilities as listed below:

1. Buckingham at Norwood, Norwood, New Jersey
2. Cambridge at Cedar Grove, Cedar Grove, New Jersey
3. Briarwood Care and Rehab, South Amboy, New Jersey
4. Windsor Gardens Care Center, east Orange, New Jersey
5. Cornell Hall Nursing and rehab Center, Union, New Jersey
6. Ashbrook Nursing and rehab Center, Scotch Plains, New Jersey
7. Green Brook Manor Nursing and Rehab Center, Green Brook, New Jersey
8. Llanfair House, Wayne, New Jersey
9. Newark Extended Care Facility, Newark, New Jersey

Your services shall terminate no later than Thursday, June 7, 2012

We appreciate the opportunity to work with AMT and please extend our thanks and appreciation to the clinical staff responsible for servicing each of the above accounts.

Sincerely,

John Kruger
Senior Vice President

# EXHIBIT 2



6/14/12

Ms. Lisa Allegri
Regional Manager
Gordian Medical.Inc. dba
American Medical Technologies
17595 Cartwright Road
Irvine, CA  92614

**Re: Confirmation of Relationship Notwithstanding Letter of May 9, 2012**

Dear Lisa:

I understand American Medical Technologies (AMT) received a letter dated May 9, 2012 apparently signed by me on behalf of CPS Services, and that the letter purported to terminate the contractual relationship between AMT and CPS Services as to nine facilities where AMT provides wound care services.

This will confirm that I did not sign or send that letter, and no one was authorized to sign or send it on my behalf.  CPS Services has no desire to end its relationship with AMT at this time.

Sincerely,

John Kruger
Senior Vice President

# EXHIBIT 3

# American Medical Technologies

## WORKFORCE CONFIDENTIALITY AGREEMENT

The federally mandated HIPAA Rules and Regulations require that all Insurance Providers hold in complete confidence all Patient, Order and Insurance Information. American Medical Technologies's business may involve the sale of medical goods and the filing of claims with insurance carriers and state and federal agencies. All patient, order and billing information has been authorized to American Medical Technologies and the companies that it bills for, and is strictly confidential. American Medical Technologies's billing procedures, client information and ongoing business is privileged, confidential and not to be conveyed, discussed or made aware of, by any means of communication to any person, company or entity outside of the American Medical Technologies Office, without managements' approval.

I understand that American Medical Technologies has a legal and ethical responsibility to maintain patient privacy, including obligations to protect the confidentiality of patient information and to safeguard the privacy of patient information.

In addition, I understand that during the course of my employment at American Medical Technologies, I may see or hear other confidential information such as financial data and operational information pertaining to the practice that American Medical Technologies is obligated to maintain as confidential.

As a condition of my employment with American Medical Technologies I understand that I am not obligated to sign and comply with this agreement. By signing this document I understand and agree that:

I will disclose Patient Information and/or confidential information only if such disclosure complies with American Medical Technologies policies, and is required for performance of my job.

My personal access code(s), user ID(s), access key(s) and password(s) used to access computer systems or other equipment are to be kept confidential at all times.

I will not access or view any information other than what is required to do my job. If I have any question about whether access to certain information is required for me to do my job, I will immediately ask my supervisor/manager for clarification.

I will not discuss any information pertaining to American Medical Technologies in an area where unauthorized individuals may hear such information (examples, in hallways, on elevators, at restaurants, on public transportation, at social events). I understand that it is not acceptable to discuss any American Medical Technologies information in public areas even if specifics such as a patient's name are not used.

I will not make inquiries about any American Medical Technologies information for any individual or party who does not have proper authorization to access such information.

I will not make any unauthorized transmissions, copies, disclosures, inquiries, modifications, or purging of Patient Information or Confidential Information. Such unauthorized transmissions include but are not limited to, removing and/or transferring Patient Information or Confidential Information from a American Medical Technologies Computer or American Medical Technologies computer system to unauthorized locations.

Upon termination of my employment with American Medical Technologies I will immediately return all property (ie. keys, documents, ID badges, etc.) to American Medical Technologies.

I agree that my obligations under this agreement regarding Patient Information will continue after the termination of my employment with American Medical Technologies.

I understand that any violation of the Agreement may result in disciplinary action up to and including termination of my employment with American Medical Technologies and/or suspension, restriction or loss of in accordance with American Medical Technologies's policies, as well as potential civil and criminal legal penalties.

I, understand that any Confidential Information or Patient Information that I access or view at American Medical Technologies does not belong to me.

I understand that during my employment with American Medical Technologies, this Confidentiality Agreement must be renewed on a annual basis.

I have read the above agreement and agree to comply with all its terms as a condition of continuing employment.

(BETSY)
Employee Signature: _Elizabeth J Oheyra_                    Date: _12 6 - 04_

Witness Signature: _Pamela Hill_                    Date: _12 6 '04_

American Medical Technologies _Curk Balser) MD CWC_                    Date: _12-6-04_

# EXHIBIT 4

## AGREEMENT REGARDING EMPLOYEE HANDBOOK, INTELLECTUAL PROPERTY, CONFIDENTIALITY AND NON-COMPETITION

I, the undersigned "Employee," in consideration of (a) my continued employment with Gordian Medical, Inc. ("Company"), and (b) a discretionary bonus and/or stock option grant which Company has agreed to provide me upon my signing this agreement, hereby acknowledge and agree that:

**1.      Handbook Acknowledgement.** I have read the Employee Handbook at www.hrpassport.com, including all online addenda thereto (the "Handbook"). It is my responsibility to review and comply with the policies in the Handbook. If I have questions about the Handbook, it is my responsibility to ask my supervisor about them. Company is free to change the policies in the Handbook at any time without notice or consideration. The Handbook is not a contract between Company and me, nor is it a guarantee of any specific policies or length of employment. My employment is "at-will" unless I have otherwise entered into an agreement with Company.

**2.      Creative Works.** All creative works which I produce during my employment related to Company, its business or technology (collectively, the "Works"; each a "Work") are deemed created for Company in the course of my employment. I represent and warrant that the Works are original and do not infringe the rights of any other work. Company shall have full ownership of all Works, and I will have no rights of ownership in any Works, regardless whether any Work would otherwise be considered a work for hire. If any Works are determined by a court of competent jurisdiction not to be a work for hire under U.S. copyright laws, this agreement shall operate as an irrevocable assignment by me to Company of the copyright in such Works, including all rights thereunder in perpetuity. Under this irrevocable assignment, I assign to Company the sole and exclusive right, title, and interest in and to the Works, without further consideration, and will assist Company in registering and enforcing all copyrights and other rights and protections relating to the Works in any and all countries.

**3.      Inventions.** I will communicate to Company promptly in writing, in such format as Company deems appropriate, all inventions conceived by me whether alone or jointly with others from my time of entering Company's employ until I leave, and upon request, will assign to Company any inventions which relate to (a) a field in which Company has an interest, or (b) any work which I may do for Company (collectively "Inventions"). I will maintain adequate permanent records of all Inventions, in the form of memoranda or drawings relating thereto. Both these records and the Inventions themselves are the property of Company at all times.

**4.      Cooperation.** I will cooperate with and assist Company and its nominees, at their expense, during my employment and thereafter, in securing and protecting patent, copyright or other similar rights in the U.S. and foreign countries in Works and Inventions. In this connection I will execute all papers which Company deems necessary to protect its interests, including assignments of invention and copyrights, and will give evidence and testimony as necessary to secure and enforce Company's rights. I hereby appoint Company as my agent and attorney-in-fact to act for and in my stead to execute, register, and file any applications, and to do all other acts to further the registration, prosecution, issuance, renewal, and extension of patents, copyrights or other protections with the same legal effect as if executed by me.

**5.      Confidential Information.** As used herein, the term "Confidential Information" means any and all confidential, proprietary or secret information, including that conceived or developed by Employee, applicable to or in any way related to (i) the present or future business of Company, (ii) the research and development of Company, or (iii) the business of any client or vendor of Company. Such Confidential Information of Company includes, by way of example and without limitation, trade secrets, processes, formulas, data, program documentation, algorithms, source codes, object codes, know-how, improvements, inventions, techniques, all plans or strategies for marketing, development and pricing, all information concerning existing or potential clients or vendors, and all similar information disclosed to Company by others. The Confidential Information is a special, valuable, and unique asset of Company, and I will at all times during the period of my employment, and at all times after termination of such employment, not use (except as my duties for Company may require) or disclose for any purpose, and keep in strict confidence, all Confidential Information.

**6.      Pre-Employment Activities.** I will not disclose to any other employee of Company any information as to which I owe a continuing obligation of confidentiality to a previous employer or client. Any works or inventions which were conceived by me prior to my employment are excluded from this agreement, and I warrant that there are no such works or inventions, other than those listed on Exhibit A hereto.

**7.      Termination; Non-Competition.** Upon termination of my employment with Company, (a) I will deliver to it all records, data and memoranda of any nature in my possession or control related to my employment or the activities of Company, including, for example, notebooks, diaries, reports, photographs, films, manuals and computer software media, and (b) I will honor and abide by my continuing obligation of confidentiality. I will not engage in Competition (as defined below) with Company, within the territory which I service during my employment, while I am a Company employee and for a period of one year after termination of my employment for any reason. As used herein, "Client" means any person or organization (including, for example, a nursing home, doctor's office or other facility) which refers beneficiaries to Company, and/or to whom or on whose behalf I render any services during my employment with Company. "Competition" means: (a) during my employment with Company, except in the course of such employment, (i) soliciting or accepting employment with, or (ii) rendering any services whatsoever to, any Client; and (b) after termination of my employment, (i) soliciting or accepting employment with, or (ii) rendering services related to wound prevention or treatment to, any Client.

**8.      Miscellaneous.** Nothing herein shall bind me or Company to any specific term or employment, nor shall the termination of my employment in any way affect my obligations under this agreement. This agreement is subject to, and will be interpreted under, California law. Jurisdiction and venue for any action hereunder shall be in Orange County, California.

IN WITNESS WHEREOF, I have executed this agreement as of the date below.

"Employee"

Signed:   *Betsy Meyers*

Printed:   **Betsy Meyers**

Dated:   **Dec 7, 2010**

**Exhibit A**
**Employee's Pre-Existing Works and Inventions**

IF NONE, STATE "NONE" HERE: _none_____ AND INITIAL HERE: _EJH_____

| Number | Name | Description | Type of Media | Date Created |
|--------|------|-------------|---------------|--------------|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

**Gaetani, Michael P.**

| | |
|---|---|
| **From:** | EchoSign [echosign@echosign.com] |
| **Sent:** | Tuesday, December 07, 2010 10:50 PM |
| **To:** | Betsy Meyers; Nick Percival |
| **Subject:** | The Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition. (between Gordian Medical, Inc. and Betsy Meyers) is Signed and Filed! |
| **Attachments:** | Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition. - signed.pdf |



## The Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition. (between Gordian Medical, Inc. and Betsy Meyers) is Signed and Filed!

**To:** Betsy Meyers (Betsy.Meyers@amtwoundcare.com)

Attached is a signed copy of the **Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition.**.

Copies have been automatically sent to all parties to the agreement. You can view a copy in your EchoSign account.

Click here to send out another document through EchoSign.

**Why use EchoSign:**

- Exchange, Sign, and File Any Document. In Seconds!
- Set-up Reminders. Instantly Share Copies with Others.
- See All of Your Documents, Anytime, Anywhere.

To ensure that you continue receiving our emails, please add echosign@echosign.com to your address book or safe list.

# EXHIBIT 5

# GORDIAN MEDICAL INC. (AMERICAN MEDICAL TECHNOLOGIES)

## Exit--Acknowledgement and Checklist

Name:  Betsy Meyers                                                    Date:  May 23, 2012

**PLEASE READ THE FOLLOWING CAREFULLY *BEFORE* YOU INITIAL AND SIGN THIS EXIT INTERVIEW FORM**

✓ I hereby authorize the Company (Gordian Medical Inc./American Medical Technologies), its employees and its representatives to release the below checked information in response to requests to provide employment reference and verification information. I agree to release and hold harmless the Company, its officers, agents, employees and assigns from any and all liability of whatever kind which may or might at any time hereafter result because of the Company's compliance with this authorization and request to release information, or any attempt made to comply with it. *Without this authorization, the Company will only provide dates of employment.*          (initial)

**Please Check one below:**

☐ *You may provide any information regarding my employment, job performance, or related matters*

☒ *Please limit information to the following (check all that apply):*

| | | |
|---|---|---|
| ☒ Dates of Employment | ☒ Job Title - Responsibilities | ☐ Rehire Status |
| ☒ Final Salary | ☐ Performance | ☐ Reason for Leaving |

✓ I have reported all work-related injuries and illnesses that may have occurred during my employment with the Company. I am not aware of any symptoms of illness or injury resulting from my employment at the Company.          (initial)

✓ I have returned, or will return to the Company, all property belonging to the Company including but not limited to equipment, confidential information, whether stored electronically or on paper, and all copies thereof. Any exceptions to this are listed below and I acknowledge my responsibility to return said objects by the date indicated.          (initial)

✓ I have complied with and will continue to comply with all the terms of any/all agreements that I have signed (confidentiality, trade secrets, employee handbook), and will not disclose any information that is confidential or could be detrimental to the Company.          (initial)

✓ I also agree that I will preserve as confidential and not use, for the benefit of myself or others, any confidential information, customer lists, product designs, processes, or other information that has now or could in the future have economic value to the Company.          (initial)

✓ The employee and the Company mutually agree that with the delivery of the final paycheck (which will include earnings for all work performed through this date and pay for any and all accrued but unused benefits) and the return of Company property as listed below, there are no claims against the Employee by the Company and no claims against the Company by the Employee and each releases the other as of this date.

*This form continues on the next page and contains signature and dates*

AMT Folders, Letterhead envelopes
Paperwork
AMT Pen, Labels Videos, Flashlights, Minos Fact Sheets
Trifolds, AMT Post-its Business Cards
Roller bag
Shreader
L awards   WHCA + Aging services of MN

✓ The Company property to be returned is as follows: (the exit interview manager should insert NA in the date returned section if an item does not apply): If the property has not been returned as of the date this form is completed and signed, insert the date upon which the employee has agreed to return the item.

## PLEASE SEND ALL ITEMS UPS GROUND

| Company Property | Date of Return | Employee Initials | Manager Initials |
|---|---|---|---|
| Company Car – Corp will instruct | 5/26/12 | Egr | |
| Company Car - Fuel Card – stays with the car | 5/25/12 | Egr | |
| Company Car - Maintenance Card - stays with the car | 5/25/12 | Egr | |
| Company Car - Insurance Card - stays with the car | 5/25/12 | Egr | |
| Company Car - GPS System – **Return to Corp** | N/A | used my own GPS Egr | |
| Cell Phone/Charger/Headset/Earpiece – Return to Corp | 5/25/12 | Egr | JF |
| Resident and Facility Files – Manager will instruct | 5/25/12 | Egr | |
| Shredder – Keep in trunk | 5/25/12 | Egr | |
| Camera - **Return to Corp** | 5/25/12 | Egr | JF |
| Laptop/Case/AMT Software/Battery Charger/ Battery/ Extra Battery – **Return to Corp** | 5/25/12 | Egr | JF |
| Tablet Pen (Stylus) – **Return to Corp** | 5/25/12 | Egr | JF |
| Air Card - **Return to Corp** | 5/25/12 | Egr | |
| Printer - Keep in car or otherwise instructed | N/A | returned to corp months ago | |
| Roller Bag – **Return to Corp** | 5/25/12 | Egr | JF |
| Marketing Materials – Manger will instruct | 5/25/12 | Egr | |
| Training Manual/ CD– **Return to Corp** | N/A | did not have | |
| Education Binder/ CD – **Return to Corp** | N/A | did not have | |
| Wound Educators Materials – **Return to Corp** | 5/25/12 | Egr | returned KRB |
| Name Tag - Discard | N/A | lost several weeks ago - not replaced | |

I have returned the above listed property and voluntarily completed and signed this exit interview acknowledgement.

_Elizabeth J Myers_
**Employee's Signature**

_5/31/12_
**Date**

I have reviewed this form and its' contents with the employee and discussed the options indicated thereon:

_____
**Manager's Signature**

_____
**Date**

*End of Acknowledgement and Checklist*

# EXHIBIT 6



**GMI**

GORDIAN MEDICAL, INC.

May 25, 2012

**By Email wbmeyers@sbcglobal.net**
Ms. Betsy Meyers
980 Cobblers Crossing
Elgin, IL  60120

Re:    **Demand to Cease and Desist Use of, and Confirm Destruction of,
       Intellectual Property Owned by Gordian Medical, Inc. ("Gordian")**

Dear Betsy:

    I understand that between May 19 and May 23, 2012, in some cases while your employment with Gordian was suspended pending investigation of your unprofessional conduct, and in other cases after you had been notified that your employment was to terminate, you misappropriated – by emailing to one or more accounts outside of the Gordian employee network – dozens of confidential documents belonging to Gordian.  These documents concern Gordian's sales data, client relationships, internal business processes, and other confidential and proprietary information.  The documents have titles or subject fields such as "Documentation Collection Procedures: Internal Use Only," "RFMS Group Product Sales Report," "Petersen Health Care," "Meadowbrook Manor Update," and "Medical Records Needed to Support Medicare Wound Products."  As you know, there are many more – this is merely a representative sample.

    Many of these documents, e.g., "Documentation Collection Procedures: Internal Use Only," are copyrighted works created and owned exclusively by Gordian (collectively the "Gordian Copyrighted Works").  Further, many of these documents, e.g., "RFMS Group Product Sales Report," are trade secrets created and owned exclusively by Gordian (collectively the "Gordian Trade Secrets").  The Gordian Copyrighted Works and the Gordian Trade Secrets are together referred to herein as the "Gordian Intellectual Property."

    You neither asked for, nor received, permission to use, reproduce or distribute the Gordian Intellectual Property, and by this letter you are put on notice that you may not do so.  This letter is to advise you that possession, reproduction, use and/or distribution of the Gordian Intellectual Property without authorization is a violation of state and federal laws.  Therefore, your use of the Gordian Intellectual Property for any purpose amounts to willful violation of these laws.  In order to avoid further liability for theft and misuse of these items, you must

*Wound Care Products and*
*Education to the Medical Community*

**17595 CARTWRIGHT ROAD**
IRVINE, CA 92614-5847
PHONE:    (714) 556-0200
FAX:        (714) 556-0300

Ms. Betsy Meyers
May 25, 2012
Page 2 of 3

immediately cease and desist such activities, destroy any Gordian Intellectual Property you misappropriated and/or have in your possession or control, cause Kathy Kennedy and any other third parties to whom you have transferred any Gordian Intellectual Property do the same, and certify in writing that you have done so by signing and returning the attached affidavit.

### Violation of Trade Secret Laws

The Gordian Trade Secrets are protected by various state and federal laws, including the U.S. Economic Espionage Act, 18 U.S.C. §§1831 et seq., and the Illinois Trade Secrets Act, IL ST CH 765 § 1065/1 et seq.  These laws impose both civil and criminal liability on those who misappropriate trade secrets.

### Violation of Copyright Laws

The Gordian Copyrighted Works are protected by the U.S. Copyright Act, and infringers are subject to an action for an injunction, damages, and other relief as a court may provide. 17 U.S.C. §501.  Further, willful copyright infringement for commercial advantage or private financial gain subjects an infringer to criminal prosecution and up to ten years in prison. 17 U.S.C. §506; 18 U.S.C. §2319.

### Unfair Business Practices

In addition to violating state and federal copyright and trade secret laws, any use of the Gordian Intellectual Property by you or others to compete against Gordian would violate Illinois unfair competition law.  *See, e.g., A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.* (7th Cir. 1992) 956 F.2d 1399; *Lynch Ford, Inc. v. Ford Motor Co., Inc.* (N.D. Ill. 1997) 957 F. Supp. 142; *McIntosh v. Magna Sys., Inc.* (N.D. Ill. 1982) 539 F. Supp. 1185.  For example, use of the Gordian Intellectual Property by you or others to induce long term care facilities, hospice providers or others to cease doing business with Gordian would constitute  tortious interference with prospective economic advantage.  *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.* (7th Cir. 1992) 956 F.2d 1399.

Based on the foregoing, I demand that you:

(i)      immediately cease and desist any and all use or distribution, in whole or in part, of any and all Gordian Intellectual Property, and any works derived therefrom;

(ii)     immediately destroy all copies of Gordian Intellectual Property in your possession or control;

(iii)    immediately cause Kathy Kennedy and any other third parties to whom you have transferred, and/or allowed to be transferred, any Gordian Intellectual

Ms. Betsy Meyers
May 25, 2012
Page 3 of 3

Property to destroy all Gordian Intellectual Property in their possession or control;

(iv)     desist from any further infringement of Gordian's rights, whether copyrights, trade secrets, trademarks or other intellectual property rights, now and in the future; and

(v)      certify to Gordian in writing, by signing and returning the attached affidavit, that you have complied with and will continue to comply with the foregoing.

Gordian takes protection of its assets seriously, and therefore, expects your compliance herewith no later than Friday, June 1, 2012.  Otherwise, we may seek injunctive relief, damages, attorneys' fees, and any other relief available.

Further, I remind you of your obligations under section 7 of the "Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition" which you signed, which provides in relevant part:

I will not engage in Competition (as defined below) with Company, within the territory which I service during my relationship ... for a period of one year after termination of my relationship for any reason.  As used herein, "Client" means any person or organization (including, for example, a nursing home, doctor's office or other facility) which refers beneficiaries to Company, and/or to whom or on whose behalf I render any services during my relationship with Company.  "Competition" means: ... after termination of my relationship, (i) soliciting or accepting a relationship with, or (ii) rendering services related to wound prevention or treatment to, any Client.

If necessary, we will take steps to enforce this provision under Illinois law.  *See, e.g., Health Professionals, Ltd. v. Johnson* (2003) 339 Ill.App.3d 1021.

This letter is not intended as a full statement of the facts in this matter, nor is it a waiver of any of Gordian's rights or remedies, whether at law or in equity, all of which are hereby expressly reserved.

Sincerely,

David R. Simon, Esq.
Vice President and General Counsel

# EXHIBIT 7

Sep 25 06 03:39p   Betsy Meyers                    847-742-3142          p.13
Sep 12 06 09:27p   Kathleen E. Kennedy             1-630-850-9432        P. 1

# American Medical Technologies

# WORKFORCE CONFIDENTIALITY AGREEMENT

The federally mandated HIPAA Rules and Regulations require that all Insurance Providers hold in complete confidence all Patient, Order and Insurance Information. American Medical Technologies's business may involve the sale of medical goods and the filing of claims with insurance carriers and state and federal agencies. All patient, order and billing information has been authorized to American Medical Technologies and the companies that it bills for, and is strictly confidential. American Medical Technologies's billing procedures, client information and ongoing business is privileged, confidential and not to be conveyed, discussed or made aware of, by any means of communication to any person, company or entity outside of the American Medical Technologies Office, without managements' approval.

I understand that American Medical Technologies has a legal and ethical responsibility to maintain patient privacy, including obligations to protect the confidentiality of patient information and to safeguard the privacy of patient information.

In addition, I understand that during the course of my employment at American Medical Technologies, I may see or hear other confidential information such as financial data and operational information pertaining to the practice that American Medical Technologies is obligated to maintain as confidential.

As a condition of my employment with American Medical Technologies I understand that I am not obligated to sign and comply with this agreement. By signing this document I understand and agree that:

I will disclose Patient Information and/or confidential Information only if such disclosure complies with American Medical Technologies policies, and is required for performance of my job.

My personal access code(s), user ID(s), access key(s) and password(s) used to access computer systems or other equipment are to be kept confidential at all times.

I will not access or view any information other than what is required to do my job. If I have any question about whether access to certain information is required for me to do my job, I will immediately ask my supervisor/manager for clarification.

I will not discuss any information pertaining to American Medical Technologies in an area where unauthorized individuals may hear such information (examples, in hallways, on elevators, at restaurants, on public transportation, at social events). I understand that it is not acceptable to discuss any American Medical Technologies information in public areas even if specifics such as a patient's name are not used.

I will not make inquiries about any American Medical Technologies information for any individual or party who does not have proper authorization to access such information.

I will not make any unauthorized transmissions, copies, disclosures, inquiries, modifications, or purging of Patient Information or Confidential Information. Such unauthorized transmissions include but are not limited to, removing and/or transferring Patient Information or Confidential Information from a American Medical Technologies Computer or American Medical Technologies computer system to unauthorized locations.

Upon termination of my employment with American Medical Technologies I will immediately return all property (ie. keys, documents, ID badges, etc.) to American Medical Technologies.

I agree that my obligations under this agreement regarding Patient Information will continue after the termination of my employment with American Medical Technologies.

I understand that any violation of the Agreement may result in disciplinary action up to and including termination of my employment with American Medical Technologies and/or suspension, restriction or loss of in accordance with American Medical Technologies's policies, as well as potential civil and criminal legal penalties.

I, understand that any Confidential Information or Patient Information that I access or view at American Medical Technologies does not belong to me.

I understand that during my employment with American Medical Technologies, this Confidentiality Agreement must be renewed on a annual basis.

I have read the above agreement and agree to comply with all its terms as a condition of continuing employment.

Employee Signature: _Kathleen E. Kennedy_            Date: _9-12-06_

Witness Signature: _____            Date: _____

American Medical Technologies: _____            Date: _____

# EXHIBIT 8

## AGREEMENT REGARDING EMPLOYEE HANDBOOK, INTELLECTUAL PROPERTY, CONFIDENTIALITY AND NON-COMPETITION

I, the undersigned "Employee," in consideration of (a) my continued employment with Gordian Medical, Inc. ("Company"), and (b) a discretionary bonus and/or stock option grant which Company has agreed to provide me upon my signing this agreement, hereby acknowledge and agree that:

**1.    Handbook Acknowledgement.**  I have read the Employee Handbook at www.hrpassport.com, including all online addenda thereto (the "Handbook").  It is my responsibility to review and comply with the policies in the Handbook.  If I have questions about the Handbook, it is my responsibility to ask my supervisor about them.  Company is free to change the policies in the Handbook at any time without notice or consideration.  The Handbook is not a contract between Company and me, nor is it a guarantee of any specific policies or length of employment.  My employment is "at-will" unless I have otherwise entered into an agreement with Company.

**2.    Creative Works.**  All creative works which I produce during my employment related to Company, its business or technology (collectively, the "Works"; each a "Work") are deemed created for Company in the course of my employment.  I represent and warrant that the Works are original and do not infringe the rights of any other work.  Company shall have full ownership of all Works, and I will have no rights of ownership in any Works, regardless whether any Work would otherwise be considered a work for hire.  If any Works are determined by a court of competent jurisdiction not to be a work for hire under U.S. copyright laws, this agreement shall operate as an irrevocable assignment by me to Company of the copyright in such Works, including all rights thereunder in perpetuity.  Under this irrevocable assignment, I assign to Company the sole and exclusive right, title, and interest in and to the Works, without further consideration, and will assist Company in registering and enforcing all copyrights and other rights and protections relating to the Works in any and all countries.

**3.    Inventions.**  I will communicate to Company promptly in writing, in such format as Company deems appropriate, all Inventions conceived by me whether alone or jointly with others from my time of entering Company's employ until I leave, and upon request, will assign to Company any inventions which relate to (a) a field in which Company has an interest, or (b) any work which I may do for Company (collectively "Inventions").  I will maintain adequate permanent records of all Inventions, in the form of memoranda or drawings relating thereto.  Both these records and the Inventions themselves are the property of Company at all times.

**4.    Cooperation.**  I will cooperate with and assist Company and its nominees, at their expense, during my employment and thereafter, in securing and protecting patent, copyright or other similar rights in the U.S. and foreign countries in Works and Inventions.  In this connection I will execute all papers which Company deems necessary to protect its interests, including assignments of invention and copyrights, and will give evidence and testimony as necessary to secure and enforce Company's rights.  I hereby appoint Company as my agent and attorney-in-fact to act for and in my stead to execute, register, and file any applications, and to do all other acts to further the registration, prosecution, issuance, renewal, and extension of patents, copyrights or other protections with the same legal effect as if executed by me.

**5.    Confidential Information.**  As used herein, the term "Confidential Information" means any and all confidential,

proprietary or secret information, including that conceived or developed by Employee, applicable to or in any way related to (i) the present or future business of Company, (ii) the research and development of Company, or (iii) the business of any client or vendor of Company.  Such Confidential Information of Company includes, by way of example and without limitation, trade secrets, processes, formulas, data, program documentation, algorithms, source codes, object codes, know-how, improvements, inventions, techniques, all plans or strategies for marketing, development and pricing, all information concerning existing or potential clients or vendors, and all similar information disclosed to Company by others.  The Confidential Information is a special, valuable, and unique asset of Company, and I will at all times during the period of my employment, and at all times after termination of such employment, not use (except as my duties for Company may require) or disclose for any purpose, and keep in strict confidence, all Confidential Information.

**6.    Pre-Employment Activities.**  I will not disclose to any other employee of Company any information as to which I owe a continuing obligation of confidentiality to a previous employer or client.  Any works or inventions which were conceived by me prior to my employment are excluded from this agreement, and I warrant that there are no such works or inventions, other than those listed on Exhibit A hereto.

**7.    Termination; Non-Competition.**  Upon termination of my employment with Company, (a) I will deliver to it all records, data and memoranda of any nature in my possession or control related to my employment or the activities of Company, including, for example, notebooks, diaries, reports, photographs, films, manuals and computer software media, and (b) I will honor and abide by my continuing obligation of confidentiality.  I will not engage in Competition (as defined below) with Company, within the territory which I service during my employment, while I am a Company employee and for a period of one year after termination of my employment for any reason.  As used herein, "Client" means any person or organization (including, for example, a nursing home, doctor's office or other facility) which refers beneficiaries to Company, and/or to whom or on whose behalf I render any services during my employment with Company.  "Competition" means: (a) during my employment with Company, except in the course of such employment, (i) soliciting or accepting employment with, or (ii) rendering any services whatsoever to, any Client; and (b) after termination of my employment, (i) soliciting or accepting employment with, or (ii) rendering services related to wound prevention or treatment to, any Client.

**8.    Miscellaneous.**  Nothing herein shall bind me or Company to any specific term or employment, nor shall the termination of my employment in any way affect my obligations under this agreement.  This agreement is subject to, and will be interpreted under, California law.  Jurisdiction and venue for any action hereunder shall be in Orange County, California.

IN WITNESS WHEREOF, I have executed this agreement as of the date below.

"Employee"

Signed:    _Kathleen E. Kennedy_
           Kathleen E. Kennedy (Dec 9, 2010)

Printed:    Kathleen E. Kennedy

Dated:    Dec 9, 2010

**Exhibit A**
**Employee's Pre-Existing Works and Inventions**

IF NONE, STATE "NONE" HERE: <u>None</u>   AND INITIAL HERE: <u>kk</u>

| Number | Name | Description | Type of Media | Date Created |
|--------|------|-------------|---------------|--------------|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

# EXHIBIT 9

# American Medical Technologies

## WORKFORCE CONFIDENTIALITY AGREEMENT

The federally mandated HIPAA Rules and Regulations require that all Insurance Providers hold in complete confidence all Patient, Order and Insurance Information. American Medical Technologies's business may involve the sale of medical goods and the filing of claims with insurance carriers and state and federal agencies. All patient, order and billing information has been authorized to American Medical Technologies and the companies that it bills for, and is strictly confidential. American Medical Technologies's billing procedures, client information and ongoing business is privileged, confidential and not to be conveyed, discussed or made aware of, by any means of communication to any person, company or entity outside of the American Medical Technologies Office, without managements' approval.

I understand that American Medical Technologies has a legal and ethical responsibility to maintain patient privacy, including obligations to protect the confidentiality of patient information and to safeguard the privacy of patient information.

In addition, I understand that during the course of my employment at American Medical Technologies, I may see or hear other confidential information such as financial data and operational information pertaining to the practice that American Medical Technologies is obligated to maintain as confidential.

As a condition of my employment with American Medical Technologies I understand that I am not obligated to sign and comply with this agreement.  By signing this document I understand and agree that:

I will disclose Patient Information and/or confidential information only if such disclosure complies with American Medical Technologies policies, and is required for performance of my job.

My personal access code(s), user ID(s), access key(s) and password(s) used to access computer systems or other equipment are to be kept confidential at all times.

I will not access or view any information other than what is required to do my job.  If I have any question about whether access to certain information is required for me to do my job, I will immediately ask my supervisor/manager for clarification.

I will not discuss any information pertaining to American Medical Technologies in an area where unauthorized individuals may hear such information (examples, in hallways, on elevators, at restaurants, on public transportation, at social events).  I understand that it is not acceptable to discuss any American Medical Technologies information in public areas even if specifics such as a patient's name are not used.

I will not make inquiries about any American Medical Technologies information for any individual or party who does not have proper authorization to access such information.

I will not make any unauthorized transmissions, copies, disclosures, inquiries, modifications, or purging of Patient Information or Confidential Information.  Such unauthorized transmissions include but are not limited to, removing and/or transferring Patient Information or Confidential Information from a American Medical Technologies Computer or American Medical Technologies computer system to unauthorized locations.

Upon termination of my employment with American Medical Technologies I will immediately return all property (ie, keys, documents, ID badges, etc.) to American Medical Technologies.

I agree that my obligations under this agreement regarding Patient Information will continue after the termination of my employment with American Medical Technologies.

I understand that any violation of the Agreement may result in disciplinary action up to and including termination of my employment with American Medical Technologies and/or suspension, restriction or loss of in accordance with American Medical Technologies's policies, as well as potential civil and criminal legal penalties.

I, understand that any Confidential Information or Patient Information that I access or view at American Medical Technologies does not belong to me.

I have read the above agreement and agree to comply with all its terms as a condition of continuing employment.

Employee Signature: _Phyllis Evans-Niessen_                Date: _____

Witness Signature: _____                Date: _____

American Medical Technologies: _____                Date: _____

# EXHIBIT 10

## AGREEMENT REGARDING EMPLOYEE HANDBOOK, INTELLECTUAL PROPERTY, CONFIDENTIALITY AND NON-COMPETITION

I, the undersigned "Employee," in consideration of (a) my continued employment with Gordian Medical, Inc. ("Company"), and (b) a discretionary bonus and/or stock option grant which Company has agreed to provide me upon my signing this agreement, hereby acknowledge and agree that:

**1.     Handbook Acknowledgement.** I have read the Employee Handbook at www.hrpassport.com, including all online addenda thereto (the "Handbook"). It is my responsibility to review and comply with the policies in the Handbook. If I have questions about the Handbook, it is my responsibility to ask my supervisor about them. Company is free to change the policies in the Handbook at any time without notice or consideration. The Handbook is not a contract between Company and me, nor is it a guarantee of any specific policies or length of employment. My employment is "at-will" unless I have otherwise entered into an agreement with Company.

**2.     Creative Works.** All creative works which I produce during my employment related to Company, its business or technology (collectively, the "Works"; each a "Work") are deemed created for Company in the course of my employment. I represent and warrant that the Works are original and do not infringe the rights of any other work. Company shall have full ownership of all Works, and I will have no rights of ownership in any Works, regardless whether any Work would otherwise be considered a work for hire. If any Works are determined by a court of competent jurisdiction not to be a work for hire under U.S. copyright laws, this agreement shall operate as an irrevocable assignment by me to Company of the copyright in such Works, including all rights thereunder in perpetuity. Under this irrevocable assignment, I assign to Company the sole and exclusive right, title, and interest in and to the Works, without further consideration, and will assist Company in registering and enforcing all copyrights and other rights and protections relating to the Works in any and all countries.

**3.     Inventions.** I will communicate to Company promptly in writing, in such format as Company deems appropriate, all inventions conceived by me whether alone or jointly with others from my time of entering Company's employ until I leave, and upon request, will assign to Company any inventions which relate to (a) a field in which Company has an interest, or (b) any work which I may do for Company (collectively "Inventions"). I will maintain adequate permanent records of all Inventions, in the form of memoranda or drawings relating thereto. Both these records and the Inventions themselves are the property of Company at all times.

**4.     Cooperation.** I will cooperate with and assist Company and its nominees, at their expense, during my employment and thereafter, in securing and protecting patent, copyright or other similar rights in the U.S. and foreign countries in Works and Inventions. In this connection I will execute all papers which Company deems necessary to protect its interests, including assignments of invention and copyrights, and will give evidence and testimony as necessary to secure and enforce Company's rights. I hereby appoint Company as my agent and attorney-in-fact to act for and in my stead to execute, register, and file any applications, and to do all other acts to further the registration, prosecution, issuance, renewal, and extension of patents, copyrights or other protections with the same legal effect as if executed by me.

**5.     Confidential Information.** As used herein, the term "Confidential Information" means any and all confidential, proprietary or secret information, including that conceived or developed by Employee, applicable to or in any way related to (i) the present or future business of Company, (ii) the research and development of Company, or (iii) the business of any client or vendor of Company. Such Confidential Information of Company includes, by way of example and without limitation, trade secrets, processes, formulas, data, program documentation, algorithms, source codes, object codes, know-how, improvements, inventions, techniques, all plans or strategies for marketing, development and pricing, all information concerning existing or potential clients or vendors, and all similar information disclosed to Company by others. The Confidential Information is a special, valuable, and unique asset of Company, and I will at all times during the period of my employment, and at all times after termination of such employment, not use (except as my duties for Company may require) or disclose for any purpose, and keep in strict confidence, all Confidential Information.

**6.     Pre-Employment Activities.** I will not disclose to any other employee of Company any information as to which I owe a continuing obligation of confidentiality to a previous employer or client. Any works or inventions which were conceived by me prior to my employment are excluded from this agreement, and I warrant that there are no such works or inventions, other than those listed on Exhibit A hereto.

**7.     Termination; Non-Competition.** Upon termination of my employment with Company, (a) I will deliver to it all records, data and memoranda of any nature in my possession or control related to my employment or the activities of Company, including, for example, notebooks, diaries, reports, photographs, films, manuals and computer software media, and (b) I will honor and abide by my continuing obligation of confidentiality. I will not engage in Competition (as defined below) with Company, within the territory which I service during my employment, while I am a Company employee and for a period of one year after termination of my employment for any reason. As used herein, "Client" means any person or organization (including, for example, a nursing home, doctor's office or other facility) which refers beneficiaries to Company, and/or to whom or on whose behalf I render any services during my employment with Company. "Competition" means: (a) during my employment with Company, except in the course of such employment, (i) soliciting or accepting employment with, or (ii) rendering any services whatsoever to, any Client; and (b) after termination of my employment, (i) soliciting or accepting employment with, or (ii) rendering services related to wound prevention or treatment to, any Client.

**8.     Miscellaneous.** Nothing herein shall bind me or Company to any specific term or employment, nor shall the termination of my employment in any way affect my obligations under this agreement. This agreement is subject to, and will be interpreted under, California law. Jurisdiction and venue for any action hereunder shall be in Orange County, California.

IN WITNESS WHEREOF, I have executed this agreement as of the date below.

"Employee"

Signed:     _Joellen Fischer_
            Joellen Fischer (Dec. 8, 2010)

Printed:     Joellen Fischer

Dated:      Dec 8, 2010

**Exhibit A**
**Employee's Pre-Existing Works and Inventions**

IF NONE, STATE "NONE" HERE: JF _____ AND INITIAL HERE: _JF_____

| Number | Name | Description | Type of Media | Date Created |
|--------|------|-------------|---------------|--------------|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

| | |
|---|---|
| **From:** | EchoSign <echosign@echosign.com> |
| **Sent:** | Wednesday, December 08, 2010 5:28 PM |
| **To:** | Jo  Fischer; Nick Percival |
| **Subject:** | The Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition. (between Gordian Medical, Inc. and Joellen Fischer) is Signed and Filed! |
| **Attachments:** | Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition. - signed.pdf |

# The Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition. (between Gordian Medical, Inc. and Joellen Fischer) is Signed and Filed!

To: Joellen Fischer (Jo.fischer@amtwoundcare.com)

Attached is a signed copy of the **Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition..**

Copies have been automatically sent to all parties to the agreement. You can view a copy in your EchoSign account.

Click here to send out another document through EchoSign.

Why use EchoSign:

- Exchange, Sign, and File Any Document. In Seconds!
- Set-up Reminders. Instantly Share Copies with Others.
- See All of Your Documents, Anytime, Anywhere.

To ensure that you continue receiving our emails, please add echosign@echosign.com to your address book or safe list.

Confidentiality Notice
This email (including any attachments) contains confidential information which may involve a patient. You are required under federal law to maintain the confidentiality of any patient information, and your failure to do so may be punishable by civil and criminal penalties. If you are not the intended recipient of this email, you must not review, forward or duplicate this email, and you should contact the sender and destroy all copies of the original email.

# EXHIBIT 11



# GMI

GORDIAN MEDICAL, INC.

### Acknowledgement of Receipt of
### Severance and General Release Agreement and Older Worker Benefit Protection Act Disclosure

I acknowledge that I received the attached Separation and General Release Agreement ("Agreement") and Older Worker Benefit Protection Act Disclosure ("OWBPA Disclosure") for my review and consideration on the date below. I understand that I have **forty-five (45)** days to decide whether to accept and execute the Agreement and return the Agreement to the Company. I also understand that, if I accept the Agreement, I will have **seven (7) days** from the date of my execution of the Agreement to revoke my acceptance and to notify the Company of such revocation. Finally, I understand that the Company's ability to pay the Severance Payment (as defined in the Agreement) is subject to the approval of the Bankruptcy Court, as set forth in Paragraph 3 of the Agreement.

_____        4-10-12
Kathleen Kennedy                       Dated

*Wound Care Products and*
*Education to the Medical Community*

17595 CARTWRIGHT ROAD
IRVINE, CA 92614-5847
PHONE:    (714) 555-0200
FAX:      (714) 556-0300

## SEPARATION AND GENERAL RELEASE AGREEMENT

This Separation and General Release Agreement ("Agreement") is made and entered by and between Kathleen Kennedy ("Employee") and Gordian Medical, Inc. dba American Medical Technologies ("Employer" or "Company"). For good and valuable consideration as reflected below, Employee and Employer contract and agree as follows:

### RECITALS

A.     Prior hereto Employee was employed by Company. Employee's employment terminated as of March 23, 2012 (the "Termination Date").

B.     Employee and Company enter into this Agreement in order to resolve any and all issues that exist, or may in the future exist, between them arising from or relating to Employee's hire, employment and termination, and to preserve the goodwill existing between them.

C.     On February 24, 2012, Company filed in the U.S. Bankruptcy Court, Central District of California, Santa Ana Division (the "Bankruptcy Court"), that certain action styled *In Re: Gordian Medical, Inc. dba American Medical Technologies*, Case No. 8:12-12339-MW, seeking protection under Chapter 11 of Title 11 the U.S. Code (the "Bankruptcy Case").

**NOW, THEREFORE,** in consideration of the covenants contained herein and other valuable consideration, the sufficiency of which is hereby acknowledged by the parties, the parties mutually agree as follows:

### AGREEMENT

1.     **Termination from Employment.** Employee's employment with the Company has terminated. Employee hereby waives any claim to reinstatement or further employment with Employer. In the event Employee obtains employment contrary to this provision, Employee agrees that this provision constitutes just cause for his/her termination regardless of the length of Employee's employment at the time of separation.

2.     **No Admissions.** Employer and Employee both agree that they are not entering into this Agreement because of any wrongdoing or liability of the other party or on the part of any other individual or company released in this Agreement. Therefore, this Agreement cannot and will not be considered as an admission of wrongdoing or liability by any of them.

3.     **Severance Payment.** Under the terms of this Agreement, and subject to the approval of the Bankruptcy Court, as evidenced by an order signed by the judge presiding over the Bankruptcy Case, Employer intends to provide Employee with severance equal to a gross amount of $7,650 less all applicable withholdings required and/or authorized by law (hereinafter "Severance Payment"). The Severance Payment is to be paid no later than ten (10) calendar days after the Effective Date of this Agreement as defined in Paragraph 19 below. The Severance Payment will be deemed paid on the date of its mailing via first class United States Mail to Employee's

1

residential address.   Employer will exercise commercially reasonable efforts to obtain the Bankruptcy Court's approval of this Agreement and authorization for Employer to pay Employee the Severance Payment.      However, Employee acknowledges that such approval and authorization are within the Bankruptcy Court's sole discretion, and the Bankruptcy Court may refuse to provide such approval and authorization.   In such event, this Agreement will terminate and be of no further force or effect as set forth in Paragraph 19 below.

**4. Additional Benefits for Signing Agreement.**  Employee acknowledges and agrees that the Severance Payment as set forth in Paragraph 3 above is an item that Employee would not be entitled to receive but for signing this Agreement.

**5. Employee's Release of Claims.**  Employee on behalf of himself/herself, his or her agents, attorneys, successors in interest, subrogees, subrogors, heirs, executors, administrators and assigns hereby releases and forever discharges Employer, and all persons, agents, servants, representatives, officers, directors, stockholders, employees, specifically including, but not limited to attorneys, associations, joint ventures, corporations, parent corporations, subsidiaries, affiliates, partners, members, predecessors and successors in interest, assigns, and assigns, and all other legal entities with whom Employer has been, is now, or may hereafter be affiliated with, including but not limited to Omnicom, Diversified Agency Services, a division of Omnicom ("Releasees") from any and all claims, demands, obligations, actions, causes of action, liabilities, and losses of every kind and nature whatsoever from any and all liability for claims known or unknown arising prior to the date of execution of this Agreement.   This release includes, without limiting the generality of the foregoing: any and all claims, demands, causes of actions, obligations, charges, damages, liabilities, attorneys' fees and costs relating to, arising out of, or based upon claims of harassment, discrimination, and/or retaliation in violation of local, State or Federal law; all claims of violation of public policy, including a claim for wrongful and/or constructive termination of employment; all claims based on tort, including claims for assault, battery, and sexual battery, and/or breach of contract, whether written or oral, express or implied, and any covenant of good faith and fair dealing; any claim for unlawful or unfair business practices; all claims for emotional distress; any all claims which were or could have been asserted by Employee; and all claims generally relating to Employee's employment with Employer and the cessation thereof, including any alleged violation of any federal, state or other governmental statute, regulation or ordinance, including without limitation:

    (a)    The Civil Rights Acts of 1866, 1964, and 1991, as amended;

    (b)    42 U.S.C. § 1981;

    (c)    The California Fair Employment and Housing Act;

    (d)    Section 503 of the Rehabilitation Act of 1973;

    (e)    The Fair Labor Standards Act (including the Equal Pay Act);

    (f)    The California and United States Constitutions;

    (g)    The California Labor Code;

    (h)    The California Business and Professions Code;

    (i)    The Employment Retirement Security Act, as amended;

    (j)    The California Family Rights Act;

    (k)    The Age Discrimination in Employment Act of 1967, as amended;

(l)     The Americans with Disabilities Act;
(m)    The Family Medical Leave Act;
(n)     The California Pregnancy Discrimination Act;
(o)     The California Wage Orders;
(p)     The National Labor Relations Act;
(q)     The Immigration Reform and Control Act;
(r)     California Occupational Safety and Health Act, or the Federal equivalent;
(s)     The Federal Worker Adjustment and Retraining Notification Act.

(t)     The California Worker Adjustment and Retraining Notification Act.

This release in all respects has been voluntarily and knowingly executed with the express intention of effecting the legal consequences provided in the California *Civil Code* § 1542, that is, the extinguishment of obligations herein designated.  Notwithstanding the foregoing, the release in this paragraph does not include claims for vested and accrued benefits under any benefit plan that is subject to the Employee Retirement Income Security Act of 1974 as amended.

**6. Civil Code Section 1542 Waiver.**  Employee further agrees that the provisions of California *Civil Code* § 1542 are waived.  California *Civil Code* § 1542 provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Except as otherwise expressly provided in this Agreement, Employee (a) agrees that this Agreement shall be effective as a bar, waiver and release of each and every known or unknown claim, demand, cause of action, obligation, damage, and/or liability mentioned in this Paragraph and (b) Employee agrees that it is his\her intent to provide a full and final release of all claims against and obligations of any and all Releasees referred to above, including claims and obligations that are not presently known or anticipated.  The waivers and releases of this Paragraph do not include any claims that cannot be released by law or any rights that may arise after the date this Agreement is executed.

**7. Acknowledgement of Receipt of All Wages Due.**  Employee agrees and acknowledges that any dispute related to the payment of wages or other compensation to Employee is hereby resolved to Employee's complete and full satisfaction and that he or she has, in fact, received all wages and compensation to which he or she is due with the sole exception of the Severance Payment referenced in Paragraph 3 of the Agreement.

**8. CFRA Acknowledgment.**  Employee acknowledges that he or she does not now have nor has he or she ever had any claims against Releasees under the California Family Rights Act.

3

**9. Covenant Not to Sue.**  As of the date of execution of this Agreement, Employee has not filed any charge, complaint, or lawsuit over any claim(s) referred to in Paragraph 5 above.  Employee understands that while he or she is permitted by law to file an agency charge, should any such charge or action be filed by Employee or on Employee's behalf involving matters covered by this Agreement, Employee agrees to promptly give the agency or court having jurisdiction a copy of this Agreement and inform them that Employee has fully settled any and all claims and potential claims.  Employee agrees not to file any lawsuit at any time over any claims released in this Agreement and agrees to notify Employer immediately if Employee should do so before the Effective Date of this Agreement.

**10. Liens or Assignments.**  Employee hereby agrees, represents and warrants that he or she shall have sole responsibility for the satisfaction of any and all liens or assignments in law, equity, or otherwise, against any of the matters released herein, and that he or she will fully satisfy all liens. if any, immediately upon receipt of the Severance Payment.  Employee further represents, agrees and warrants that he or she shall defend, hold Releases harmless from, and indemnify Releasees from, any liabilities or costs which they may incur as a result of any liens of any nature and/or Employee's failure to satisfy any liens.

**11. Waiver of Recovery.**  Employee waives any right Employee may have to recover in any proceeding that results from a charge or action filed by Employee or by any other person or entity, including any state or federal agency.  For example, Employee waives any right to monetary recovery or reinstatement if a charge or action is successfully brought by Employee, or any other person or entity, including any state or federal agency, against any person, entity, or corporation released by this Agreement.  Employee's waiver of the right to monetary recovery or reinstatement also applies to any settlement of any charge or action brought by Employee or by any other person or entity, including any state, federal, or local agency.

**12. Confidentiality.**  Employee agrees to keep the terms and conditions of this Agreement confidential and shall not disclose them to any other person or entity, with the limited exception that Employee may disclose the terms to Employee's spouse, attorney, and/or financial advisor, and Employee shall be responsible for requiring confidentiality on their part.

**13. No Disparaging Conduct.**  Employee agrees and promises that he or she will not undertake any harassing or disparaging conduct directed at the Releasees, and that he or she will refrain from making any negative, detracting, derogatory, and unfavorable statements about the Releasees.  Employee further agrees and promises that he or she will not induce or incite claims of discrimination, harassment, retaliation, wrongful discharge, wage and hour and/or labor code violations, or any other claims against Employer, any subsidiary or affiliate of Employer, or any of its individual employees, shareholders, partners, members, officers, directors, or agents by any other person.

**14. Confidential, Proprietary or Trade Information.**  Employee promises and agrees that Employee shall not disclose any Confidential, Proprietary or Trade Information of Employer to

4

any other person or entity.  Employee further agrees not to use such Confidential, Proprietary or Trade Secret Information of Employer for any personal or business purpose.

**15. Employer Property.**  Employee hereby represents and warrants that on or before the date of Employee's separation, Employee will return to Employer all Employer property and copies thereof in Employee's custody, including, but not limited to, company-issued keys, the originals and copies of all business documents, computer software, print-outs, brochures, product information, personnel records, confidential proprietary management information, and any other documents related to Employer or its business.

**16. Entire Agreement.**  This Agreement contains the entire agreement of both Employer and Employee and takes the place of any and all other agreements, understandings, negotiations, or discussions, whether oral or written, express or implied, between Employer and Employee. Employer and Employee each acknowledge that no representations have been made to them which are not contained in the Agreement, that they have not signed this Agreement in reliance on any representation not expressly set forth in this Agreement, and that any representations of any kind not contained in this Agreement shall not be valid or binding, unless, following the signing of this Agreement, the parties put such a modification in a writing signed by both an authorized representative of Employer and Employee.

**17.  No Penalty for Failure to Enforce Rights.**  A party's failure to enforce any rights and privileges under this Agreement shall not constitute a waiver of any such rights and privileges.

**18.  Full and Knowing Waiver.**  By signing this Agreement, Employee certifies that:

      a.      Employee has carefully read and fully understands this Agreement;

      b.      Employee was advised by Employer in writing, via this Agreement, to consult with an attorney before signing this Agreement;

      c.      Employee understands that he or she is not waiving rights or claims that may arise after the date that this Agreement is executed and

      d.      Employee agrees to the terms knowingly, voluntarily and without intimidation, coercion or pressure.

**19.  Consideration and Revocation of Agreement.**  Employee has a period of forty-five (45) days to consider whether to enter into and execute this Agreement.  Employee understands that this forty-five (45) day period shall begin to run on the day Employee receives this Agreement. If Employee accepts this Agreement by signing it, Employee may revoke such acceptance by notifying Employer in a signed letter or memo within seven (7) days after signing the Agreement.  To be effective, Employee must ensure that this revocation is received by David Simon, Vice President and General Counsel of Employer, at the following address, no later than the close of business on the seventh day following Employee's execution of this Agreement.

David Simon
Vice President and General Counsel
Gordian Medical, Inc.
17595 Cartwright Road
Irvine, CA  92614
Fax:  949-553-1767
Email:  david.simon@amtwoundcare.com

Revocation can be made by hand-delivery, email, facsimile, or other written means as long as it is received by Employer no later than close of business on the seventh day following Employee's execution of this Agreement.  Both Employer and Employee acknowledge that this Agreement shall not be effective unless and until the Bankruptcy Court authorizes Employer to pay Employee the Severance Payment ("Effective Date").  If, within 120 days after Employee's execution of this Agreement, the Bankruptcy Court has not issued an order authorizing Employer to pay Employee the Severance Payment, this Agreement shall thereupon terminate and be void and of no further force or effect.  In such event, each party shall have the rights and obligations he, she or it had prior to signing this Agreement.

**20. Conditions of Breach by Employee.**  Employee specifically agrees that the Company's payments to Employee under this Agreement are made in return for Employee's obligations set forth in this Agreement.  Employee further agrees that if he or she breaches any of the obligations set forth in this Agreement, such a breach would cause harm to Employer and its business, for which Employer may recover damages.

**21. Cancellation of Rights and Stock Option Agreement.**  As of the Termination Date, all equity, ownership right, or interest in the Company issued or issuable to Employee under any stock option plan(s), award(s) and/or agreement(s) shall terminate.

**22. Provisions Severable.**  The parties agree that if any provisions of this Agreement should be declared illegal or invalid, the remaining provisions will continue to be binding and enforceable.

**23. Headings and Terms.**  The paragraph headings of this Agreement are for convenience only and are not intended to have any effect in construing or interpreting this Agreement.  The term "including" in this Agreement is used to list items by examples only, not as a complete listing.

**24. Separate Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be considered an original Agreement.  Facsimile reproductions of original signatures shall be binding for the purpose of the executing and enforcing this Agreement.

**25. Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and the Releasees and the respective heirs, executors, administrators, personal representatives, successors, and assigns of the parties and Releasees.

6

AGREED BY THE PARTIES:

_____

Kathleen Kennedy

Date: ___4 - 10 - 12_____

Gordian Medical, Inc. dba American Medical Technologies

By: _____

Title: _____

Date: _____

7

# EXHIBIT 12



# GMI
GORDIAN MEDICAL, INC.

### Acknowledgement of Receipt of
### Severance and General Release Agreement and Older Worker Benefit Protection Act
### Disclosure

I acknowledge that I received the attached Separation and General Release Agreement ("Agreement") and Older Worker Benefit Protection Act Disclosure ("OWBPA Disclosure") for my review and consideration on the date below. I understand that I have **forty-five (45) days** to decide whether to accept and execute the Agreement and return the Agreement to the Company. I also understand that, if I accept the Agreement, I will have **seven (7) days** from the date of my execution of the Agreement to revoke my acceptance and to notify the Company of such revocation. Finally, I understand that the Company's ability to pay the Severance Payment (as defined in the Agreement) is subject to the approval of the Bankruptcy Court, as set forth in Paragraph 3 of the Agreement.

_____        4-23-2012
Joellen Fischer                                     Dated

*Wound Care Products and
Education to the Medical Community*

17595 CARTWRIGHT ROAD
Irvine, CA 92614-5847
PHONE:     (714) 556-0200
FAX:         (714) 556-0300

## SEPARATION AND GENERAL RELEASE AGREEMENT

This Separation and General Release Agreement ("Agreement") is made and entered by and between Joellen Fischer ("Employee") and Gordian Medical, Inc. dba American Medical Technologies ("Employer" or "Company").  For good and valuable consideration as reflected below, Employee and Employer contract and agree as follows:

## RECITALS

A.     Prior hereto Employee was employed by Company.  Employee's employment terminated as of March 23, 2012 (the "Termination Date").

B.     Employee and Company enter into this Agreement in order to resolve any and all issues that exist, or may in the future exist, between them arising from or relating to Employee's hire, employment and termination, and to preserve the goodwill existing between them.

C.     On February 24, 2012, Company filed in the U.S. Bankruptcy Court, Central District of California, Santa Ana Division (the "Bankruptcy Court"), that certain action styled *In Re: Gordian Medical, Inc. dba American Medical Technologies,* Case No. 8:12-12339-MW, seeking protection under Chapter 11 of Title 11 the U.S. Code (the "Bankruptcy Case").

**NOW, THEREFORE**, in consideration of the covenants contained herein and other valuable consideration, the sufficiency of which is hereby acknowledged by the parties, the parties mutually agree as follows:

## AGREEMENT

**1.     Termination from Employment.**   Employee's employment with the Company has terminated.  Employee hereby waives any claim to reinstatement or further employment with Employer.  In the event Employee obtains employment contrary to this provision, Employee agrees that this provision constitutes just cause for his/her termination regardless of the length of Employee's employment at the time of separation.

**2.  No Admissions.**   Employer and Employee both agree that they are not entering into this Agreement because of any wrongdoing or liability of the other party or on the part of any other individual or company released in this Agreement.  Therefore, this Agreement cannot and will not be considered as an admission of wrongdoing or liability by any of them.

**3.  Severance Payment.**   Under the terms of this Agreement, and subject to the approval of the Bankruptcy Court, as evidenced by an order signed by the judge presiding over the Bankruptcy Case, Employer intends to provide Employee with severance equal to a gross amount of $5,492.31 less all applicable withholdings required and/or authorized by law (hereinafter "Severance Payment").  The Severance Payment is to be paid no later than ten (10) calendar days after the Effective Date of this Agreement as defined in Paragraph 19 below.  The Severance Payment will be deemed paid on the date of its mailing via first class United States Mail to

1

Employee's residential address.   Employer will exercise commercially reasonable efforts to obtain the Bankruptcy Court's approval of this Agreement and authorization for Employer to pay Employee the Severance Payment.   However, Employee acknowledges that such approval and authorization are within the Bankruptcy Court's sole discretion, and the Bankruptcy Court may refuse to provide such approval and authorization.   In such event, this Agreement will terminate and be of no further force or effect as set forth in Paragraph 19 below.

**4. Additional Benefits for Signing Agreement.**   Employee acknowledges and agrees that the Severance Payment as set forth in Paragraph 3 above is an item that Employee would not be entitled to receive but for signing this Agreement.

**5. Employee's Release of Claims.**   Employee on behalf of himself/herself, his or her agents, attorneys, successors in interest, subrogees, subrogors, heirs, executors, administrators and assigns hereby releases and forever discharges Employer, and all persons, agents, servants, representatives, officers, directors, stockholders, employees, specifically including, but not limited to attorneys, associations, joint ventures, corporations, parent corporations, subsidiaries, affiliates, partners, members, predecessors and successors in interest, insurers, and assigns, and all other legal entities with whom Employer has been, is now, or may hereafter be affiliated with, including but not limited to Omnicom, Diversified Agency Services, a division of Omnicom ("Releasees") from any and all claims, demands, obligations, actions, causes of action, liabilities, and losses of every kind and nature whatsoever from any and all liability for claims known or unknown arising prior to the date of execution of this Agreement.   This release includes, without limiting the generality of the foregoing: any and all claims, demands, causes of actions, obligations, charges, damages, liabilities, attorneys' fees and costs relating to, arising out of, or based upon claims of harassment, discrimination, and/or retaliation in violation of local, State or Federal law; all claims of violation of public policy, including a claim for wrongful and/or constructive termination of employment; all claims based on tort, including claims for assault, battery, and sexual battery, and/or breach of contract, whether written or oral, express or implied, and any covenant of good faith and fair dealing; any claim for unlawful or unfair business practices; all claims for emotional distress; any all claims which were or could have been asserted by Employee; and all claims generally relating to Employee's employment with Employer and the cessation thereof, including any alleged violation of any federal, state or other governmental statute, regulation or ordinance, including without limitation:

(a)   The Civil Rights Acts of 1866, 1964, and 1991, as amended;
(b)   42 U.S.C. § 1981;
(c)   The California Fair Employment and Housing Act;
(d)   Section 503 of the Rehabilitation Act of 1973;
(e)   The Fair Labor Standards Act (including the Equal Pay Act);
(f)   The California and United States Constitutions;
(g)   The California Labor Code;
(h)   The California Business and Professions Code;
(i)   The Employment Retirement Security Act, as amended;
(j)   The California Family Rights Act;
(k)   The Age Discrimination in Employment Act of 1967, as amended;

2

(l)     The Americans with Disabilities Act;
(m)    The Family Medical Leave Act;
(n)     The California Pregnancy Discrimination Act;
(o)     The California Wage Orders;
(p)     The National Labor Relations Act;
(q)     The Immigration Reform and Control Act;
(r)     California Occupational Safety and Health Act, or the Federal equivalent;
(s)     The Federal Worker Adjustment and Retraining Notification Act.

(t)     The California Worker Adjustment and Retraining Notification Act.

This release in all respects has been voluntarily and knowingly executed with the express intention of effecting the legal consequences provided in the California *Civil Code* § 1542, that is, the extinguishment of obligations herein designated. Notwithstanding the foregoing, the release in this paragraph does not include claims for vested and accrued benefits under any benefit plan that is subject to the Employee Retirement Income Security Act of 1974 as amended.

**6. Civil Code Section 1542 Waiver.** Employee further agrees that the provisions of California *Civil Code* § 1542 are waived. California *Civil Code* § 1542 provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Except as otherwise expressly provided in this Agreement, Employee (a) agrees that this Agreement shall be effective as a bar, waiver and release of each and every known or unknown claim, demand, cause of action, obligation, damage, and/or liability mentioned in this Paragraph and (b) Employee agrees that it is his\her intent to provide a full and final release of all claims against and obligations of any and all Releasees referred to above, including claims and obligations that are not presently known or anticipated. The waivers and releases of this Paragraph do not include any claims that cannot be released by law or any rights that may arise after the date this Agreement is executed.

**7. Acknowledgement of Receipt of All Wages Due.** Employee agrees and acknowledges that any dispute related to the payment of wages or other compensation to Employee is hereby resolved to Employee's complete and full satisfaction and that he or she has, in fact, received all wages and compensation to which he or she is due with the sole exception of the Severance Payment referenced in Paragraph 3 of the Agreement.

**8. CFRA Acknowledgment.** Employee acknowledges that he or she does not now have nor has he or she ever had any claims against Releasees under the California Family Rights Act.

**9. Covenant Not to Sue.** As of the date of execution of this Agreement, Employee has not filed any charge, complaint, or lawsuit over any claim(s) referred to in Paragraph 5 above. Employee understands that while he or she is permitted by law to file an agency charge, should any such charge or action be filed by Employee or on Employee's behalf involving matters covered by this Agreement, Employee agrees to promptly give the agency or court having jurisdiction a copy of this Agreement and inform them that Employee has fully settled any and all claims and potential claims. Employee agrees not to file any lawsuit at any time over any claims released in this Agreement and agrees to notify Employer immediately if Employee should do so before the Effective Date of this Agreement.

**10. Liens or Assignments.** Employee hereby agrees, represents and warrants that he or she shall have sole responsibility for the satisfaction of any and all liens or assignments in law, equity, or otherwise, against any of the matters released herein, and that he or she will fully satisfy all liens, if any, immediately upon receipt of the Severance Payment. Employee further represents, agrees and warrants that he or she shall defend, hold Releasees harmless from, and indemnify Releasees from, any liabilities or costs which they may incur as a result of any liens of any nature and/or Employee's failure to satisfy any liens.

**11. Waiver of Recovery.** Employee waives any right Employee may have to recover in any proceeding that results from a charge or action filed by Employee or by any other person or entity, including any state or federal agency. For example, Employee waives any right to monetary recovery or reinstatement if a charge or action is successfully brought by Employee, or any other person or entity, including any state or federal agency, against any person, entity, or corporation released by this Agreement. Employee's waiver of the right to monetary recovery or reinstatement also applies to any settlement of any charge or action brought by Employee or by any other person or entity, including any state, federal, or local agency.

**12. Confidentiality.** Employee agrees to keep the terms and conditions of this Agreement confidential and shall not disclose them to any other person or entity, with the limited exception that Employee may disclose the terms to Employee's spouse, attorney, and/or financial advisor, and Employee shall be responsible for requiring confidentiality on their part.

**13. No Disparaging Conduct.** Employee agrees and promises that he or she will not undertake any harassing or disparaging conduct directed at the Releasees, and that he or she will refrain from making any negative, detracting, derogatory, and unfavorable statements about the Releasees. Employee further agrees and promises that he or she will not induce or incite claims of discrimination, harassment, retaliation, wrongful discharge, wage and hour and/or labor code violations, or any other claims against Employer, any subsidiary or affiliate of Employer, or any of its individual employees, shareholders, partners, members, officers, directors, or agents by any other person.

**14. Confidential, Proprietary or Trade Information.** Employee promises and agrees that Employee shall not disclose any Confidential, Proprietary or Trade Information of Employer to

4

any other person or entity.  Employee further agrees not to use such Confidential, Proprietary or Trade Secret Information of Employer for any personal or business purpose.

**15. Employer Property.**  Employee hereby represents and warrants that on or before the date of Employee's separation, Employee will return to Employer all Employer property and copies thereof in Employee's custody, including, but not limited to, company-issued keys, the originals and copies of all business documents, computer software, print-outs, brochures, product information, personnel records, confidential proprietary management information, and any other documents related to Employer or its business.

**16. Entire Agreement.**  This Agreement contains the entire agreement of both Employer and Employee and  takes the place of any and all other agreements, understandings, negotiations, or discussions, whether oral or written, express or implied, between Employer and Employee. Employer and Employee each acknowledge that no representations have been made to them which are not contained in the Agreement, that they have not signed this Agreement in reliance on any representation not expressly set forth in this Agreement, and that any representations of any kind not contained in this Agreement shall not be valid or binding, unless, following the signing of this Agreement, the parties put such a modification in a writing signed by both an authorized representative of Employer and Employee.

**17.  No Penalty for Failure to Enforce Rights.**  A party's failure to enforce any rights and privileges under this Agreement shall not constitute a waiver of any such rights and privileges.

**18.  Full and Knowing Waiver.**  By signing this Agreement, Employee certifies that:

     a.     Employee has carefully read and fully understands this Agreement;

     b.     Employee was advised by Employer in writing, via this Agreement, to consult with an attorney before signing this Agreement;

     c.     Employee understands that he or she is not waiving rights or claims that may arise after the date that this Agreement is executed and

     d.     Employee agrees to the terms knowingly, voluntarily and without intimidation, coercion or pressure.

**19.  Consideration and Revocation of Agreement.**  Employee has a period of **forty-five (45) days** to consider whether to enter into and execute this Agreement.  Employee understands that this **forty-five (45) day** period shall begin to run on the day Employee receives this Agreement. If Employee accepts this Agreement by signing it, Employee may revoke such acceptance by notifying Employer in a signed letter or memo within **seven (7) days** after signing the Agreement.  To be effective, Employee must ensure that this revocation is received by David Simon, Vice President and General Counsel of Employer, at the following address, no later than the close of business on the seventh day following Employee's execution of this Agreement.

5

David Simon
Vice President and General Counsel
Gordian Medical, Inc.
17595 Cartwright Road
Irvine, CA  92614
Fax:  949-553-1767
Email:  david.simon@amtwoundcare.com

Revocation can be made by hand-delivery, email, facsimile, or other written means as long as it is received by Employer no later than close of business on the seventh day following Employee's execution of this Agreement.  Both Employer and Employee acknowledge that this Agreement shall not be effective unless and until the Bankruptcy Court authorizes Employer to pay Employee the Severance Payment ("Effective Date").  If, within 120 days after Employee's execution of this Agreement, the Bankruptcy Court has not issued an order authorizing Employer to pay Employee the Severance Payment, this Agreement shall thereupon terminate and be void and of no further force or effect.  In such event, each party shall have the rights and obligations he, she or it had prior to signing this Agreement.

**20. Conditions of Breach by Employee.**  Employee specifically agrees that the Company's payments to Employee under this Agreement are made in return for Employee's obligations set forth in this Agreement.  Employee further agrees that if he or she breaches any of the obligations set forth in this Agreement, such a breach would cause harm to Employer and its business, for which Employer may recover damages.

**21. Cancellation of Rights and Stock Option Agreement.**  As of the Termination Date, all equity, ownership right, or interest in the Company issued or issuable to Employee under any stock option plan(s), award(s) and/or agreement(s) shall terminate.

**22. Provisions Severable.**  The parties agree that if any provisions of this Agreement should be declared illegal or invalid, the remaining provisions will continue to be binding and enforceable.

**23. Headings and Terms.**  The paragraph headings of this Agreement are for convenience only and are not intended to have any effect in construing or interpreting this Agreement.  The term "including" in this Agreement is used to list items by examples only, not as a complete listing

**24. Separate Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be considered an original Agreement.  Facsimile reproductions of original signatures shall be binding for the purpose of the executing and enforcing this Agreement.

**25. Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and the Releasees and the respective heirs, executors, administrators, personal representatives, successors, and assigns of the parties and Releasees.

AGREED BY THE PARTIES:

_Joellen Fischer_      4-23-2012
Joellen Fischer

Date: ___4-23-2012___


Gordian Medical, Inc. dba American Medical Technologies


By: _____

Title: _____

Date: _____

7

## OLDER WORKER BENEFIT PROTECTION ACT REPORT
## AND NOTICE TO EMPLOYEE

The Older Worker Benefit Protection Act requires that employers who request a waiver of rights and claims under the Age Discrimination in Employment Act ("ADEA"), in connection with an employment termination program ("Program") offered to a group or class of employees, inform the employees from whom the waiver is requested of certain information. This form and report is intended to provide you with such information.

The decisional unit is all Clinical Specialists. All persons selected by the Program who are being offered and wish to accept consideration under an agreement that waives and releases their rights and claims under ADEA, must sign the agreement ("Agreement") and return it to the Company within **45** days after receiving the waiver. Once the signed Agreement is returned to the Company, the employee has **7** days to revoke the Agreement. Further, the Company will not pay any severance payments unless and until the Bankruptcy Court issues an order authorizing the payments.

The following contains a listing of the ages of persons in the decisional unit selected for the Program and the ages of all individuals with the same job titles who were not selected for the Program.

## AGES AND JOB TITLES OF EMPLOYEES
## IN DECISIONAL UNIT SELECTED FOR SEPARATION

| Age | Title |
|-----|-------|
| 26 | Clinical Specialist |
| 31 | Clinical Specialist |
| 33 | Clinical Specialist |
| 41 | Clinical Specialist |
| 44 | Clinical Specialist |
| 46 | Clinical Specialist |
| 47 | Clinical Specialist |
| 50 | Clinical Specialist |
| 50 | Clinical Specialist |
| 55 | Clinical Specialist |
| 57 | Clinical Specialist |
| 59 | Clinical Specialist |
| 62 | Clinical Specialist |
| 62 | Clinical Specialist |
| 62 | Clinical Specialist |

8

| 64 | Clinical Specialist |

**AGES AND JOB TITLES OF INDIVIDUALS IN
DECISIONAL UNIT NOT SELECTED FOR TERMINATION**

| Age | Employees at that Age | Job Title |
|---|---|---|
| 26 | 2 | Clinical Specialist |
| 28 | 1 | Clinical Specialist |
| 29 | 2 | Clinical Specialist |
| 30 | 3 | Clinical Specialist |
| 31 | 1 | Clinical Specialist |
| 32 | 4 | Clinical Specialist |
| 33 | 5 | Clinical Specialist |
| 34 | 2 | Clinical Specialist |
| 35 | 6 | Clinical Specialist |
| 37 | 11 | Clinical Specialist |
| 38 | 5 | Clinical Specialist |
| 39 | 5 | Clinical Specialist |
| 40 | 8 | Clinical Specialist |
| 41 | 4 | Clinical Specialist |
| 42 | 8 | Clinical Specialist |
| 43 | 4 | Clinical Specialist |
| 44 | 3 | Clinical Specialist |
| 45 | 7 | Clinical Specialist |
| 46 | 6 | Clinical Specialist |
| 47 | 4 | Clinical Specialist |
| 48 | 4 | Clinical Specialist |
| 49 | 6 | Clinical Specialist |
| 50 | 13 | Clinical Specialist |
| 51 | 4 | Clinical Specialist |
| 52 | 5 | Clinical Specialist |
| 53 | 4 | Clinical Specialist |
| 54 | 3 | Clinical Specialist |
| 55 | 4 | Clinical Specialist |
| 56 | 2 | Clinical Specialist |
| 57 | 5 | Clinical Specialist |
| 58 | 7 | Clinical Specialist |
| 59 | 1 | Clinical Specialist |
| 60 | 1 | Clinical Specialist |

9

| 61 | | 1 | Clinical Specialist |
|---|---|---|---|
| 62 | | 4 | Clinical Specialist |
| 64 | | 1 | Clinical Specialist |
| 65 | | 4 | Clinical Specialist |
| 66 | | 1 | Clinical Specialist |

# EXHIBIT 13

## GORDIAN MEDICAL INC. (AMERICAN MEDICAL TECHNOLOGIES)
### Exit–Acknowledgement and Checklist

Name: __Jo  Fischer__                     Date: __3/26/2012__

**PLEASE READ THE FOLLOWING CAREFULLY _BEFORE_ YOU INITIAL
AND SIGN THIS EXIT INTERVIEW FORM**

✓ I hereby authorize the Company (Gordian Medical Inc./American Medical Technologies), its employees and its representatives to release the below checked information in response to requests to provide employment reference and verification information. I agree to release and hold harmless the Company, its officers, agents, employees and assigns from any and all liability of whatever kind which may or might at any time hereafter result because of the Company's compliance with this authorization and request to release information, or any attempt made to comply with it. _Without this authorization, the Company will only provide dates of employment._            _JF_
                                                                                                                                    (Initial)

Please Check one below:
☐ You may provide _any_ information regarding my employment, job performance, or related matters
☑ **Please limit information to the following (check all that apply):**

   ☑ Dates of Employment     ☑ Job Title - Responsibilities     ☐ Rehire Status
   ☑ Final Salary            ☐ Performance            ☐ Reason for Leaving

✓ I have reported all work-related injuries and illnesses that may have occurred during my employment with the Company. I am not aware of any symptoms of illness or injury resulting from my employment at the Company.            _JF_
                                                                                                                                    (Initial)

✓ I have returned, or will return to the Company, all property belonging to the Company including but not limited to equipment, confidential information, whether stored electronically or on paper, and all copies thereof. Any exceptions to this are listed below and I acknowledge my responsibility to return said objects by the date indicated.            _JF_
                                                                                                                                    (Initial)

✓ I have complied with and will continue to comply with all the terms of any/all agreements that I have signed (confidentiality, trade secrets, employee handbook), and will not disclose any information that is confidential or could be detrimental to the Company.            _JF_
                                                                                                                                    (Initial)

✓ I also agree that I will preserve as confidential and not use, for the benefit of myself or others, any confidential information, customer lists, product designs, processes, or other information that has now or could in the future have economic value to the Company.            _JF_
                                                                                                                                    (Initial)

✓ The employee and the Company mutually agree that with the delivery of the final paycheck (which will include earnings for all work performed through this date and pay for any and all accrued but unused benefits) and the return of Company property as listed below, there are no claims against the Employee by the Company and no claims against the Company by the Employee and each releases the other as of this date. I am still owed $49.13 for fuel purchase on 3/20/12

_This form continues on the next page and contains signature and dates_

✔ The Company property to be returned is as follows: (the exit interview manager should insert NA in the date returned section if an item does not apply). If the property has not been returned as of the date this form is completed and signed, insert the date upon which the employee has agreed to return the item.

| | | | |
|---|---|---|---|
| Company Car | Returned to Enterprise | 8/26/12 | 2F |
| Company Car - Fuel Card | | 3/26/12 | 2F |
| Company Car - Maintenance Card | | 3/26/12 | 2F |
| Company Car - Insurance Card | | 3/26/12 | 2F |
| Company Car - GPS System | | N/A | 2F |
| Cell Phone/Charger/Headset/Earpiece | | 3/26/12 | 2F |
| Resident and Facility Files | | 3/26/12 | 2F |
| Shredder | | NA | 2F |
| Camera | | NA | 2F |
| Laptop/Case/AMT Software/Battery Charger/ Battery/ Extra Battery 2 Batteries sent | | 3/26/12 | 2F |
| Tablet Pen (Stylus) | | | |
| Air Card STN 1045008513 4G DOTOSUETO1 3G | | 3/26/12 | 2F |
| Printer HP1815 HP470 | | 3/26/12 | 2F |
| Name Tag | | 3/26/12 | 2F |
| Marketing Materials Brochures Folders, Pens, Post-ts | | 3/26/12 | |
| Training Manual/ CD | | 3/26/12 | |
| Education Binder/ CD | | 3/26/12 | |
| WoundEducators Materials Wound Mgmt | | 3/26/12 | |

*car charger auto pig tail*

I have returned the above listed property and voluntarily completed and signed this exit interview acknowledgement.

**Employee's Signature**          3/26/12
                                   **Date**

I have reviewed this form and its' contents with the employee and discussed the options indicated thereon:

Elizabeth Thuyan
**Manager's Signature**          3/26/12
                                 **Date**

### End of Acknowledgement and Checklist

# EXHIBIT 14

# GORDIAN MEDICAL INC. (AMERICAN MEDICAL TECHNOLOGIES)

## Exit--Acknowledgement and Checklist

Name: KATHY KENNEDY                    Date: 3-28-12

**PLEASE READ THE FOLLOWING CAREFULLY *BEFORE* YOU INITIAL AND SIGN THIS EXIT INTERVIEW FORM**

✓ I hereby authorize the Company (Gordian Medical Inc./American Medical Technologies), its employees and its representatives to release the below checked information in response to requests to provide employment reference and verification information. I agree to release and hold harmless the Company, its officers, agents, employees and assigns from any and all liability of whatever kind which may or might at any time hereafter result because of the Company's compliance with this authorization and request to release information, or any attempt made to comply with it. *Without this authorization, the Company will only provide dates of employment.*

_____ (initial)

Please Check one below:

☑ **You may provide *any* information regarding my employment, job performance, or related matters**

☐ **Please limit information to the following (check all that apply):**

☐ Dates of Employment    ☐ Job Title - Responsibilities    ☐ Rehire Status

☐ Final Salary    ☐ Performance    ☐ Reason for Leaving

✓ I have reported all work-related injuries and illnesses that may have occurred during my employment with the Company. I am not aware of any symptoms of illness or injury resulting from my employment at the Company.

_____ (initial)

✓ I have returned, or will return to the Company, all property belonging to the Company including but not limited to equipment, confidential information, whether stored electronically or on paper, and all copies thereof. Any exceptions to this are listed below and I acknowledge my responsibility to return said objects by the date indicated.

_____ (initial)

✓ I have complied with and will continue to comply with all the terms of any/all agreements that I have signed (confidentiality, trade secrets, employee handbook), and will not disclose any information that is confidential or could be detrimental to the Company.

_____ (initial)

✓ I also agree that I will preserve as confidential and not use, for the benefit of myself or others, any confidential information, customer lists, product designs, processes, or other information that has now or could in the future have economic value to the Company.

_____ (initial)

✓ The employee and the Company mutually agree that with the delivery of the final paycheck (which will include earnings for all work performed through this date and pay for any and all accrued but unused benefits) and the return of Company property as listed below, there are no claims against the Employee by the Company and no claims against the Company by the Employee and each releases the other as of this date.

*This form continues on the next page and contains signature and dates*

Name Tags
Gas Cards

✓ The Company property to be returned is as follows: (the exit interview manager should insert NA in the date returned section if an item does not apply): If the property has not been returned as of the date this form is completed and signed, <u>insert the date upon which the employee has agreed to return the item.</u>

| Company Property | Date of Return | Employee's Initials | Manager's Initials |
|---|---|---|---|
| Company Car | 3-28-12 | 7K | |
| Company Car – Fuel Card | 3-28-12 | 7K | |
| Company Car – Maintenance Card | 3-28-12 | 7K | |
| Company Car – Insurance Card | 3-28-12 | 7K | |
| Company Car – GPS System | NA | 7K | |
| Cell Phone/Charger/Headset/Earpiece | 3-28-12 | 7K | |
| Resident and Facility Files | 3-28-12 | 7K | |
| Shredder | 3-28-12 | 7K | |
| Camera | 3-28-12 | 7K | |
| Laptop/Case/AMT Software/Battery Charger/Battery/Extra Battery | 3-28-12 | 7K | |
| Tablet Pen (Stylus) | 3-28-12 | 7K | |
| Air Card | 3-28-12 | 7K | |
| Printer – portable | 3-28-12 | 7K | |
| Name Tag | 3-28-12 | 7K | |
| Marketing Materials | N/A | 7K | |
| Training Manual/ CD-7K | 3-28-12 | 7K | |
| Education Binder/ CD N/A | 3-28-12 | 7K | |
| WoundEducators Materials | 3-28-12 | 7K | |

I have returned the above listed property and voluntarily completed and signed this exit interview acknowledgement.

_Kathleen E Kennedy_                                         3-28-12
**Employee's Signature**                                         **Date**

I have reviewed this form and its' contents with the employee and discussed the options indicated thereon:

_Elizabeth Dwyer_                                         3-28-12
**Manager's Signature**                                         **Date**

*End of Acknowledgement and Checklist*

# EXHIBIT 15

### AGREEMENT REGARDING EMPLOYEE HANDBOOK, INTELLECTUAL PROPERTY, CONFIDENTIALITY AND NON-COMPETITION

I, the undersigned "Employee," in consideration of (a) my continued employment with Gordian Medical, Inc. ("Company"), and (b) a discretionary bonus and/or stock option grant which Company has agreed to provide me upon my signing this agreement, hereby acknowledge and agree that:

**1.      Handbook Acknowledgement.**  I have read the Employee Handbook at www.hrpassport.com, including all online addenda thereto (the "Handbook").  It is my responsibility to review and comply with the policies in the Handbook.  If I have questions about the Handbook, it is my responsibility to ask my supervisor about them.  Company is free to change the policies in the Handbook at any time without notice or consideration.  The Handbook is not a contract between Company and me, nor is it a guarantee of any specific policies or length of employment.  My employment is "at-will" unless I have otherwise entered into an agreement with Company.

**2.      Creative Works.**  All creative works which I produce during my employment related to Company, its business or technology (collectively, the "Works"; each a "Work") are deemed created for Company in the course of my employment.  I represent and warrant that the Works are original and do not infringe the rights of any other work.  Company shall have full ownership of all Works, and I will have no rights of ownership in any Works, regardless whether any Work would otherwise be considered a work for hire.  If any Works are determined by a court of competent jurisdiction not to be a work for hire under U.S. copyright laws, this agreement shall operate as an irrevocable assignment by me to Company of the copyright in such Works, including all rights thereunder in perpetuity.  Under this irrevocable assignment, I assign to Company the sole and exclusive right, title, and interest in and to the Works, without further consideration, and will assist Company in registering and enforcing all copyrights and other rights and protections relating to the Works in any and all countries.

**3.      Inventions.**  I will communicate to Company promptly in writing, in such format as Company deems appropriate, all inventions conceived by me whether alone or jointly with others from my time of entering Company's employ until I leave, and upon request, will assign to Company any inventions which relate to (a) a field in which Company has an interest, or (b) any work which I may do for Company (collectively "Inventions").  I will maintain adequate permanent records of all Inventions, in the form of memoranda or drawings relating thereto.  Both these records and the Inventions themselves are the property of Company at all times.

**4.      Cooperation.**  I will cooperate with and assist Company and its nominees, at their expense, during my employment and thereafter, in securing and protecting patent, copyright or other similar rights in the U.S. and foreign countries in Works and Inventions.  In this connection I will execute all papers which Company deems necessary to protect its interests, including assignments of invention and copyrights, and will give evidence and testimony as necessary to secure and enforce Company's rights.  I hereby appoint Company as my agent and attorney-in-fact to act for and in my stead to execute, register, and file any applications, and to do all other acts to further the registration, prosecution, issuance, renewal, and extension of patents, copyrights or other protections with the same legal effect as if executed by me.

**5.      Confidential Information.**  As used herein, the term "Confidential Information" means any and all confidential, proprietary or secret information, including that conceived or developed by Employee, applicable to or in any way related to (i) the present or future business of Company, (ii) the research and development of Company, or (iii) the business of any client or vendor of Company.  Such Confidential Information of Company includes, by way of example and without limitation, trade secrets, processes, formulas, data, program documentation, algorithms, source codes, object codes, know-how, improvements, inventions, techniques, all plans or strategies for marketing, development and pricing, all information concerning existing or potential clients or vendors, and all similar information disclosed to Company by others.  The Confidential Information is a special, valuable, and unique asset of Company, and I will at all times during the period of my employment, and at all times after termination of such employment, not use (except as my duties for Company may require) or disclose for any purpose, and keep in strict confidence, all Confidential Information.

**6.      Pre-Employment Activities.**  I will not disclose to any other employee of Company any information as to which I owe a continuing obligation of confidentiality to a previous employer or client.  Any works or inventions which were conceived by me prior to my employment are excluded from this agreement, and I warrant that there are no such works or inventions, other than those listed on Exhibit A hereto.

**7.      Termination; Non-Competition.**  Upon termination of my employment with Company, (a) I will deliver to it all records, data and memoranda of any nature in my possession or control related to my employment or the activities of Company, including, for example, notebooks, diaries, reports, photographs, films, manuals and computer software media, and (b) I will honor and abide by my continuing obligation of confidentiality.  I will not engage in Competition (as defined below) with Company, within the territory which I service during my employment, while I am a Company employee and for a period of one year after termination of my employment for any reason.  As used herein, "Client" means any person or organization (including, for example, a nursing home, doctor's office or other facility) which refers beneficiaries to Company, and/or to whom or on whose behalf I render any services during my employment with Company.  "Competition" means: (a) during my employment with Company, except in the course of such employment, (i) soliciting or accepting employment with, or (ii) rendering any services whatsoever to, any Client; and (b) after termination of my employment, (i) soliciting or accepting employment with, or (ii) rendering services related to wound prevention or treatment to, any Client.

**8.      Miscellaneous.**  Nothing herein shall bind me or Company to any specific term or employment, nor shall the termination of my employment in any way affect my obligations under this agreement.  This agreement is subject to, and will be interpreted under, California law.  Jurisdiction and venue for any action hereunder shall be in Orange County, California.

IN WITNESS WHEREOF, I have executed this agreement as of the date below.

"Employee"

Signed:  _Peggy T. Bates_____
          Peggy T. Bates (Dec 7, 2010)

Printed:  Peggy T. Bates_____

Dated:  Dec 7, 2010_____

**Exhibit A**
**Employee's Pre-Existing Works and Inventions**

IF NONE, STATE "NONE" HERE: none     AND INITIAL HERE: _PB_

| Number | Name | Description | Type of Media | Date Created |
|--------|------|-------------|---------------|--------------|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

| | |
|---|---|
| **From:** | EchoSign <echosign@echosign.com> |
| **Sent:** | Tuesday, December 07, 2010 8:14 PM |
| **To:** | Peggy Bates; Nick Percival |
| **Subject:** | The Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition (between Gordian Medical, Inc. and Peggy T. Bates) is Signed and Filed! |
| **Attachments:** | Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition - signed.pdf |



# The Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition (between Gordian Medical, Inc. and Peggy T. Bates) is Signed and Filed!

**To:** Peggy T. Bates (Peggy.Bates@amtwoundcare.com)

Attached is a signed copy of the Agreement Regarding Employee Handbook, Intellectual Property, Confidentiality and Non-Competition.

Copies have been automatically sent to all parties to the agreement. You can view a copy in your EchoSign account.

Click here to send out another document through EchoSign.

Why use EchoSign:

- Exchange, Sign, and File Any Document. In Seconds!
- Set-up Reminders. Instantly Share Copies with Others.
- See All of Your Documents, Anytime, Anywhere.

To ensure that you continue receiving our emails, please add echosign@echosign.com to your address book or safe list.

Confidentiality Notice
This email (including any attachments) contains confidential information which may involve a patient. You are required under federal law to maintain the confidentiality of any patient information, and your failure to do so may be punishable by civil and criminal penalties. If you are not the intended recipient of this email, you must not review, forward or duplicate this email, and you should contact the sender and destroy all copies of the original email.

# EXHIBIT 16

**From:** Brian Browning [mailto:BBrowning@prestigehcm.com]
**Sent:** Friday, July 06, 2012 1:11 PM
**To:** Nancy Mcnally
**Subject:** RE: AMT introduction and follow up

Good afternoon Nancy, I appreciate you reaching out an introducing yourself. The email your representative received is correct for the next 60 days we are evaluating another provider. The facilities involved in this evaluation are:

**Strawberry Lane**
**Friendly Village**
**Greenstone Healthcare**
**Glendale Uptown**

This evaluation is necessary as we look for the best providers the industry has to offer. With all the changes taking place in this ever changing and challenging environment we must be assured with have vendor partners that will be with us for years to come.

If you wish to have further discussion about your company and what you can and will be able to offer going forward we schedule some time with the VP of Clinical Services and myself to discuss. Please provide some dates over the next few weeks we can come together, either face to face or by conference call.

Thank you

**Brian R. Browning**
**Director of Facilities and Materials Management**
**Prestige Healthcare, LLC.**
**502-429-8062**
**Fax 502-429-5980**


*Sarah*

SARAH HOLDEN-MOUNT, PT, CWS, FACCWS
*Vice President of Business Development*

(Ph)  603-496-4151   |  (Fx)  603-821-0206

AMERICAN MEDICAL TECHNOLOGIES
a d/b/a of Gordian Medical, Inc.
*Taking the Pressure Out of Wound Care Since 1994*
www.amtwoundcare.com

1